**Mildred CASTELLOW,
et al., Plaintiffs,**

v.

**CHEVRON USA, et al., Defendants.**

**No. Civ.A.H–98–1179.**

United States District Court,
S.D. Texas,
Houston Division.

April 4, 2000.

Jeffrey Scott Thompson, Williams Bailey LLP, Houston, TX, for Mildred Castellow, plaintiffs.

Robert Philip Scott, Jr, Abrams Scott and Bickley, Houston, TX, for Chevron USA Inc., defendants.

## ORDER ON MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF FRANK GARDNER, MARVIN LEGATOR, BARRY LEVY, MYRON MEHLMAN AND VERNON ROSE

MILLOY, United States Magistrate Judge.

On September 14, 1998, the parties consented to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), for all further proceedings, including entry of final judgment. (Docket Entry # 7). Pending before the court is a request by Defendants Chevron USA, Inc. and Mobile Oil Corporation (collectively "Defendants"; "Chevron"/"Mobil") to exclude the testimony and opinions of Frank Gardner, Marvin Legator, Barry Levy, and Myron Mehlman (Motion to Exclude the Testimony and Opinions of Frank Gardner, Marvin Legator, Barry Levy and Myron Mehlman ["Defendants' Motion to Exclude"], Docket Entry # 21), and a supplement to that request, in reference to Vernon Rose. (Supplement to Defendants' Motion to Exclude the Testimony and Opinions of Plaintiffs' Expert Witnesses ["Defendants' Supplement to the Motion to Exclude"], Docket Entry # 26). Plaintiffs have responded to these requests, and Defendants have filed replies. (Plaintiffs' Response to Defendants' Motion to Exclude the Testimony and Opinions of Frank Gardner, Marvin Legator, Barry Levy, and Myron Mehlman ["Plaintiffs' Response to the Motion to Exclude"], Docket Entry # 22; Plaintiffs' Supplemental Response to Defendants' Motion to Exclude Plaintiffs' Expert Witnesses ["Supplement to Plaintiffs' Response to the Motion to Exclude"], Docket Entry # 31; Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Exclude the Testimony and Opinions of Frank Gardner, Marvin Legator, Barry Levy and Myron Mehlman ["Defendants' Reply"], Docket Entry # 23). Further, each party has been given the opportunity to develop the evidence on these issues at hearings which took place on July 26 and August 16, 1999, and each has supplied the court with an index to excerpts from the relevant testimony and exhibits. (Docket Entries # 33, # 34, # 38, # 39, # 41, # 43, # 44). Following a review of the evidence submitted, the arguments of counsel, and the applicable law, the court ORDERS that Defendants' motion to exclude the testimony and opinions of the designated expert witnesses is GRANTED. (Docket Entries # 21 and # 26)

### Background

From the submissions, the court concludes that Kenneth Castellow died on April 12, 1996, less than one month after he was diagnosed as suffering from a blood disease. Plaintiffs have shown that Mr. Castellow worked for more than 30 years as a service station attendant, manager, or owner in either Chevron (as successor to Gulf Oil) or Mobil gasoline stations. Plaintiffs report that he worked at a full service Chevron station from 1958 through 1960, and at a full service Mobil station from 1972 to 1975. Both of those stations were located within the Houston city limits. In

1975, Mr. Castellow began managing the Mobil Oakridge station in Spring, Texas, and, apparently, he worked there until 1992. Mr. Castellow was 66 years old at the time of his death, and it is his survivors, his wife and daughter, who have brought this lawsuit. Mildred Castellow, the widow and representative of the estate of Kenneth Castellow, deceased, and Virginia Schelsteder, Kenneth Castellow's daughter, claim that exposure to Defendants' products led to his death. It is undisputed that Kenneth Castellow's work, during that era, exposed him to gasoline and its constituent components. (Defendants' Motion to Exclude, pp. 1, 2). In particular, Plaintiffs allege that Kenneth Castellow died from an acute myelogenous leukemia ("AML") that was caused by exposure, during his employment years, to benzene and benzene-containing products, including gasoline. His illness is classified, more particularly, as an erythroleukemia, or AML M[6]. (Transcript from hearing on July 26, 1999, Volume 1, Docket Entry # 33, pp. 68–69).

To prosecute their toxic tort claim against Mobil/Chevron, Plaintiffs have hired several expert witnesses, including Frank Gardner, Marvin Legator, Barry Levy, Myron Mehlman, and Vernon Rose, to testify on the issue of causation. Each witness is presented in the hope that his testimony will establish proof on the claim that Mr. Castellow's AML was caused by his occupational exposure to "benzene and benzene-containing products", including gasoline, during the time he worked in, managed, or owned gasoline service stations in the Houston area. (*See* Plaintiffs' First Amended Complaint ["Complaint"], Docket Entry # 14, pp. 2–3). Each of those witnesses has submitted at least one written report in support of his opinions. (*See* Reports from Dr. Vernon Rose, Exhibits B–2, B–3, and B–4 to Plaintiffs' Index, Docket Entry # 41; Report and Affidavit from Dr. Barry Levy, Exhibits C–2, C–3 to Plaintiffs' Index, Docket Entry # 41; Report and Affidavit from Dr. Frank H. Gardner, Exhibits D–2, D–3 to

Plaintiffs' Index, Docket Entry # 41; Report and Affidavit from Dr. Myron Mehlman, Exhibits E–2, E–3 to Plaintiffs' Index, Docket Entry # 41; Report from Dr. Marvin Legator, Exhibit B–2 to Volume II of Defendants' Exhibits in Support of *Daubert* Issues ["Defendants' Exhibits in Support of Motion to Exclude"], Docket Entry # 44). Upon receipt of the initial reports, Defendants moved to strike each designated witness, asking the court to rule that the proffered evidence does not meet the requirements of FEDERAL RULE OF EVIDENCE 702, or the dictates of the United States Supreme Court decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In contesting the reliability of the Plaintiffs' proposed evidence, Defendants have submitted reports and testimony from their own expert witnesses. (Affidavit from Dr. Gerhard K. Raabe, Exhibit A to Defendants' Motion to Exclude; Affidavit from Dr. Richard D. Irons, Exhibit B to Defendants' Motion to Exclude).

Defendants complain that the evidence submitted from each of Plaintiffs' designated witnesses is unsupported in science, and in some instances, is unsupportable. Chevron/Mobil challenge whether the prospective causation evidence meets the requirements of either good science or law, and contend that it can be of no assistance to the triers of fact. Defendants' fundamental complaint is that "[t]o be legally sufficient evidence, proof of causation requires a plaintiff to prove, at a minimum, exposure to the allegedly harmful substance at a level shown by scientifically reliable studies [to be] capable of causing the complained of ailment." (Defendants' Motion to Exclude, p. 12). The court agrees with Defendants that Plaintiffs have been unable to do so in this instance. From the record, as a whole, the court concludes that the disputed opinion evidence fails scrutiny under *Daubert*. Plaintiffs' theory that Mr. Castellow developed AML as a result of his "cumulative exposure" to the benzene that is contained in

gasoline is not supported by the relevant scientific or medical literature. It is beyond this court's time or capacity to recreate or duplicate every nuance to the ably and aggressively argued issues in this case. Thankfully, excellent counsel on both sides have developed a full, intelligible, and intelligent, record on the dispute. Therefore, in discussion of the reasoning for this ruling, only those documents and items of testimony most critical to this decision will be referenced. For the reasons that follow, Defendants' motion is GRANTED.

### Standard of Review

Defendants insist that each opinion offered, to date, by Plaintiffs' designated expert witnesses is inadmissible, as it fails the threshold requirements of Rule 702 of the Federal Rules of Evidence. Rule 702 reads as follows:

Testimony by Experts.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED.R.EVID. 702. The opinion evidence tendered by Plaintiffs on the issue of causation is also subject to the interpretation of Rule 702 that is articulated in the United States Supreme Court decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court detailed the analysis that governs when a trial court is asked to decide whether proffered evidence fits within the ambit of Rule 702. To insure that any proposed scientific testimony is both reliable and relevant, *Daubert* imposes a "gatekeeping" role on trial judges which, in turn, triggers a two-part analysis. First, the trial court must determine whether the proffered testimony is reliable. That determination encompasses an assessment of whether the reasoning or methodology on which the testimony is based is scientifically valid. If so, the trial judge must then decide whether that reasoning or methodology can be applied properly to the facts at issue. In other words, whether it is relevant to the case at hand. *See Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir.1999) (citing *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786). The first prong of the analysis, that is, whether the proffered testimony is reliable, imposes an implicit requirement that the testimony be grounded "in the methods and procedures of science and ... be more than unsupported speculation or subjective belief." *See Curtis*, 174 F.3d at 668 (citing *Daubert* 509 U.S. at 590, 113 S.Ct. 2786). The burden to demonstrate that the expert's findings and conclusions are based on valid scientific method, and are therefore reliable, is placed on the party seeking its admission. *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). To assist in the first inquiry, the Supreme Court has detailed four, non-exclusive factors to guide courts in determining the reliability of the methodology at issue. Those well known factors are as follows:

(1) Whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

The Fifth Circuit, in *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194 (5th Cir.1996), emphasized that, to properly exercise the discretion that *Daubert* has conferred on trial courts, there is a duty to screen expert testimony for both relevance and reliability. The court concluded that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such

quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen,* 102 F.3d at 198 (citing *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1107 (8th Cir.1996)). It bears repeating that the determination of reliability itself, as well as those factors that must be taken into account in determining the issue of reliability, are within the discretion of the court, consistent with its "gatekeeping function" under the federal rules. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1170, 143 L.Ed.2d 238 (1999). To fulfill this gatekeeping role, the court must make an objective, independent validation of the principles and methods used by the expert to insure that they have a sound and reliable basis in the knowledge and experience of the discipline at issue. *Moore,* 151 F.3d at 276. Moreover, the *Daubert* factors do not constitute a definitive checklist, but comprise a non-exclusive, flexible test to ascertain the validity or reliability of the methodology that the expert employed. *Moore,* 151 F.3d at 275. The applicability of each factor depends upon the particular facts of the case. *Black v. Food Lion, Inc.,* 171 F.3d 308, 311 (5th Cir.1999).

### Discussion

Defendants here contend that, when scrutinized within the *Daubert* framework, the opinions submitted by Plaintiffs' designated expert witnesses fail, and they must be excluded as they fall short of that rigorous analysis. In response, Plaintiffs insist that there are questions of fact present here, which arise from the source of the disputed opinions, and, as such, those questions affect, not the admissibility of the opinions, but the weight which should be assigned to them. In raising this argument, Plaintiffs are correct in cautioning that a trial court "should take care not to mistake credibility questions for admissibility questions." (Supplement to Plaintiffs' Response to the Motion to Exclude, p. 3); *see United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1077 (5th Cir.1996). But in support of their argument, Plaintiffs

rely, primarily, on cases from outside this circuit, or on cases which pre-date more recent clarifications of the *Daubert* analysis. *See Moore,* 151 F.3d at 269; *Kumho,* 119 S.Ct. at 1167. Further, the court cannot ignore that some of the "fact questions" cited by Plaintiffs are not really matters centered on the basis for the expert's conclusions, but, instead, go to the heart of the reliability of those opinions. The case law is clear that a court's role as "gatekeeper" is to scrupulously assess the reliability of an expert's opinion before a jury is asked to weigh it. To abdicate that function is to invite a jury decision that is unreasonable because it is not derived from reliable scientific sources.

It is probably important to note that when this lawsuit was first filed, Plaintiffs were relying upon an affidavit from one of Mr. Castellow's former co-workers, Kenneth Driver, to help prove that the deceased's occupational exposure to benzene resulted in his illness and death. Kenneth Driver's affidavit stated, in unequivocal terms, that when he worked with Mr. Castellow, it was common practice to use "pure" benzene, on a daily basis, to clean automotive parts. (Affidavit of Kenneth Driver, Exhibit I to Defendants' Motion to Exclude, pp. 1–2). It seems universally accepted that daily exposure on that scale is a recognized health risk. Even Defendants do not dispute that such a practice could, in fact, result in dermal exposure to significantly harmful levels of benzene. Subsequently, however, Mr. Driver amended his statements about Mr. Castellow's routine practices. When his deposition was taken, Mr. Driver testified that Mr. Castellow did not use benzene to clean automotive parts, but instead, he and the other service station attendants used a solvent which contained benzene as an ingredient. (Deposition of Kenneth Driver, Exhibit A–2 to Volume II of Defendants' Exhibits in Support of Motion to Exclude, p. 20). He also reported that the benzene-containing solvent was a Mobil product

delivered by its employees.[1] It is apparent that, with that revised testimony, Plaintiffs' case was substantially altered. With no testimony to support the claim that Mr. Castellow experienced occupational exposure to admittedly dangerous levels of pure benzene, the allegations changed. Following that change in emphasis, each of Plaintiffs' expert witnesses then reviewed the pertinent testimony based on, more or less, the following recitation of the deceased's work duties:

> Mr. Castellow's work-place exposures occurred over his 30+ years as a service station operator for Exxon, Gulf, and Mobil. Specifically, his exposures occurred during fueling, tank gauging, tanker-truck unloading, automotive repair and parts-washing operations. The primary source of benzene was gasoline (approximately 2.5% benzene by volume) although co-workers report the use in later years of some benzene-containing solvents during parts-washing operations.

(Affidavit of Dr. Frank H. Gardner, Exhibit D-3 to Plaintiffs' Index, Docket Entry # 41, p. 3 ¶ 8). It appears that, since July 1999, the parties and experts have addressed the causation issues with that recitation as the boundary of Mr. Castellow's occupational exposure to benzene.

From the current claims and defenses, the following points seem to be undisputed: (1) the relevant medical-scientific literature supports the conclusion that cumulative benzene exposure, at levels above 200 ppmyears, can result in acute myelogenous leukemia; (2) benzene is a constituent component of gasoline; (3) by virtue of his employment as a service station attendant, manager or owner, Mr. Castellow was exposed to gasoline, and its constituent, benzene; (4) no monitoring data exists for any of the service stations at which Mr. Castel-

low worked during his employment. From those undisputed points, however, the parties' contentions diverge greatly. In sum, Defendants contend that, although the scientific literature is relatively uniform in concluding that an exposure to a high volume of benzene can, in fact, result in AML, there is no scientific or medical literature to support the proposition that there is a sufficient level of benzene, as a constituent ingredient of gasoline, to result in a similar risk of AML by virtue of exposure to gasoline alone. (Defendants' Motion to Exclude, p. 8). To support this contention, Defendants rely on, and cite, a number of scientific studies of petroleum distribution workers, or service station attendants, in which no statistically significant increase in the rate of AML has been traced to occupational exposure to gasoline.

In response, Plaintiffs argue that there is sufficient causation evidence to submit to a jury, and they point to an "exposure assessment" which was prepared by an industrial hygienist, Dr. Vernon Rose. In preparing his exposure assessment in this case, Dr. Rose relied on a "modeling formula" to calculate the level of benzene that Mr. Castellow encountered in his work life. (*See* Supplemental Report from Dr. Vernon E. Rose, Exhibit B-3 to Plaintiffs' Index, Docket Entry # 41). Defendants' objection to this proposed evidence by Dr. Rose is twofold: one, Defendants contend that when all is said and done, Mr. Castellow's exposure was to gasoline, and perhaps a small constituent of benzene present in solvents, and that the medical literature does not support the conclusion that such an amount of benzene, from gasoline, is a recognized cause of AML. Second, even if such causal connection is supported by the medical and

---

1. From all sources, the court concludes that the solvent at issue is most likely the Mobil product, Solvasol, which is said to contain less that 7 ppm benzene. (Deposition of Aubrey Brown, Exhibit C-1 to Volume I of Defendants' Exhibits in Support of the Motion to Exclude, p. 13; Deposition of Wilford Swank, Exhibit A-5 to Volume II of Defendants' Exhibits in Support of the Motion to Exclude, p. 30; Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, p. 137).

scientific literature, Defendants are adamant that these Plaintiffs have cited no reliable information about the quantities of benzene to which Mr. Castellow was exposed. Defendants argue that the "dose-response" relationship is a "unifying concept in the medical sciences" and assert that before one can form an opinion in regard to the alleged effect of a particular chemical on a human being, the purported dose amount must be understood so that it can be compared to doses that have been shown to cause a particular health effect. (Affidavit from Dr. Richard D. Irons, Exhibit B to Defendants' Motion to Exclude; Deposition of Dr. Frank H. Gardner, Exhibit D–5 to Plaintiffs' Index, Docket Entry # 41, p. 9). Defendants point out that each of Plaintiffs' expert witnesses, when asked to comment on the level of exposure in Mr. Castellow's history, either deferred to Vernon Rose, the industrial hygienist, or relied explicitly on Dr. Vernon Rose's calculations. Defendants go further in objecting to Dr. Rose's testimony by pointing out that the methodology he has chosen to support his calculations on the purported workplace exposure are unreliable. In regard to this argument, Defendants again assert two related contentions. The first is that Dr. Rose's reliance on "modeling" to calculate Kenneth Castellow's lifetime benzene exposure is an inappropriate methodology. Second, Defendants maintain that even if that methodology were acceptable, Dr. Rose's particular application of it in this instance is deeply flawed. Defendants emphasize that, in fact, Dr. Rose himself has acknowledged repeated errors in his calculations that were so critical that they lead to revisions of those estimates on three different occasions.

The court is constrained to repeat here the details of each argument presented by the parties. However, after review of the extensive material submitted, including reference to each of the medical and scientific studies or writings submitted, the court finds that Defendants' argument is well taken. In an exercise of its discre-

tion, and in deference to the gatekeeping role imposed by Rule 702, the court finds that the evidence proffered by each of Plaintiffs' expert witnesses should be excluded. It appears that the case which Plaintiffs have chosen to prosecute is a different case from the one lodged originally. It seems that Plaintiffs initiated this suit under the assumption that Mr. Castellow was exposed, daily, to pure benzene in his workplace practices. That assumption, arising from the Kenneth Driver affidavit, has since fallen by the wayside. From a review of all of the documents, the court is further convinced that the proposed expert witnesses began with the conclusion that Mr. Castellow's AML was caused by exposure to harmful levels of benzene. From that conclusion they have "worked backward" to find medical and scientific support. Such a practice cannot withstand *Daubert* scrutiny and is not due any credence in a court of law. "The overarching goal of *Daubert*'s gate-keeping requirement ... is 'to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Black*, 171 F.3d at 311 (citing *Kumho*, 119 S.Ct. at 1176).

### The Relevant Scientific Literature

It is accepted that, in evaluating a purported causal link between a chemical agent and a particular disease, epidemiological studies are the most informative. *See Allen*, 102 F.3d at 196. One set of criteria, widely used by epidemiologists in the study of disease mechanisms, is the one detailed by Sir Austin Bradford–Hill in 1965. Richard D. Irons, Ph.D., a toxicologist with an extensive background in hematology, was designated by Defendants as an expert witness in this case. In submissions before this court, Dr. Irons stated, without contradiction, that scientists generally rely on the Bradford–Hill

factors to ascertain valid opinions on medical causation.[2] Plaintiffs have never contested those factors as a reasonable approach to take in isolating the pertinent scientific/medical data from all of the information available on a given topic. Dr. Irons stated, and the court agrees, that "[a]ttempts to form opinions regarding medical causation based on documents such as [anecdotal case reports or collections of case reports] are unscientific and speculative." (Affidavit from Dr. Richard D. Irons, Exhibit B to Defendants' Motion to Exclude, p. 6). Without reproducing the text of Dr. Irons' courtroom testimony, in which he outlines his application of the Bradford–Hill criteria to the published literature on gasoline and benzene studies, the court accepts, and Plaintiffs do not dispute, that the literature selected by Dr. Irons is consistent with that criteria. Further, the studies that he relied upon are not anecdotal reports or mere collections of incidents in which the quality of the data, and/or the quality of the control is unknown or unverified. Dr. Irons's research on the published studies revealed that recent analyses (between 1937 and 1989) of the risk of leukemia among petroleum workers showed a significant risk of AML only in those workers who experienced a cumulative exposure to benzene above 200 ppmyears.[3] Ppmyears is the product of "exposure concentration and the duration of time exposed ... sometimes referred to as 'a time-weighted average' or TWA." (Affidavit from Dr. Richard D. Irons, Exhibit B to Defendants' Motion to Exclude, p. 8).

### Opinions Tendered by Dr. Vernon Rose

It cannot be disputed that Plaintiffs are relying heavily on the calculations from Dr. Vernon Rose to link Mr. Castellow's blood disease to an exposure to Defendants' products. Indeed, it must be emphasized that not one of the original reports submitted from Plaintiffs' other

**2.** Dr. Irons summarized the Bradford–Hill criteria as demanding scrutiny on a number of factors before any causation conclusion is appropriate: (1) a determination of the strength of the evidence of any association in the quantitative epidemiological literature, (2) whether the association is capable of being reproduced and been consistently observed in different quantitative epidemiological studies, and by different investigators, (3) whether the association is specific with respect to a given chemical's risk factor and a particular disease, (4) whether the temporal relationship between the exposure and risk of the disease is a factor, (5) what the dose-response relationship is between the exposure to the chemical and the risk of developing the disease, (6) whether there is a plausible biological reason to explain the risk factor in causing the disease, (7) whether the hypothesis makes sense in terms of the history and biology of the disease, and (8) whether alternative mechanisms or known risk factors exist that have a potential impact on the disease or could confound the interpretation of the results. (Affidavit from Dr. Richard D. Irons, Exhibit B to Defendants' Motion to Exclude, pp. 3–4).

**3.** Dr. Irons identified those published reports that are the most relevant to Mr. Castellow's workplace environment. These were reportedly selected because the tasks studied were the most similar to the deceased's daily work. After reviewing the literature submitted by both parties, the court agrees that the studies selected by Dr. Irons more closely track Mr. Castellow's workplace exposure. *See* Mary B. Paxton et al., *Leukemia Risk Associated with Benzene Exposure in the Pliofilm Cohort: I. Mortality Update and Exposure Distribution,* 14 ANALYSIS 147 (1994); Otto Wong, *Risk of acute myeloid leukemia and multiple myeloma in workers exposed to benzene,* 52 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380 (1995); Elsebeth Lynge et al., *Risk of Cancer and Exposure to Gasoline Vapors,* 145 AMERICAN JOURNAL OF EPIDEMIOLOGY 449 (1997); Howard E. Runion, Benzene in Gasoline (1975) (unpublished study, Gulf Oil Corporation) (on file with the medical department of the Gulf Oil Corporation); Lesley Rushton and Helena Romaniuk, *A Case–Control Study to Investigate the Risk of Leukemia Associated with Exposure to Benzene in Petroleum Marketing and Distribution Workers in the United Kingdom,* 54 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 152 (1997); Otto Wong et al., *Health Effects of Gasoline Exposure. II. Mortality Patterns of Distribution Workers in the United States,* 101 ENVIRONMENTAL HEALTH PERSPECTIVES SUPPLEMENTS 63 (1993); Otto Wong et al., *Nested Case–Control Study of Leukemia, Multiple Myeloma, and Kidney Cancer in a Cohort of Petroleum Workers Exposed to Gasoline,* 56 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 217 (1999).

expert witnesses referenced any quantified level of exposure, by Mr. Castellow, to benzene or gasoline. (*See* Report from Dr. Frank Gardner, Exhibit D–2 to Plaintiffs' Index, Docket Entry # 41; Report from Dr. Marvin Legator, Exhibit B–2 to Volume II of Defendants' Exhibits in Support of the Motion to Exclude; Report from Dr. Barry S. Levy, Exhibit C–2 to Plaintiffs' Index, Docket Entry # 41; Report from Dr. Myron Mehlman, Exhibit E–2 to Plaintiffs' Index, Docket Entry # 41). Following Dr. Rose's first report, in January 1999, and a revised report in June 1999, some of the previously named expert witnesses supplemented their original opinions and incorporated his findings. (*See* Affidavit of Dr. Barry S. Levy, Exhibit C–3 to Plaintiffs' Index, Docket Entry # 41; Affidavit of Dr. Frank H. Gardner, Exhibit D–3 to Plaintiffs' Index, Docket Entry # 41). Clearly, the significance of Dr. Rose's calculations to the other designated witnesses, cannot be overstated. After reviewing Dr. Rose's reports, the excerpts submitted from his deposition and hearing testimony, and the studies and writings that he referenced, the court concludes that his testimony and opinions on causation should be excluded. In reaching that conclusion, the court has reviewed, and relied upon, the summary chart supplied by Defendants at the July 26, 1999, hearing. ("The Rose Reports," Exhibit B to Volume I of Defendants' Exhibits in Support of the Motion to Exclude). That chart is a useful "snapshot" of each of the reports that Dr. Rose submitted. In that summary, Defendants and their expert witness, Dr. Irons, address, with some precision, the patent flaws that are present in Dr. Rose's sequential reports and which render his opinions unreliable.

There appears to be little doubt that Dr. Rose's original report, dated January 27, 1999, relied, unfortunately, but understandably, on Kenneth Driver's affidavit which recited the use of "neat" benzene, on a regular basis, to clean automobile parts. (Preliminary Report from Dr. Vernon E. Rose, Exhibit B–2 to Plaintiffs' Index, Docket Entry # 41, p. 4). Dr. Rose's next report, dated June 21, 1999, documents the first attempt by Plaintiffs to offer opinion testimony on the deceased's quantified level of benzene exposure as a result of his work experiences with gasoline or benzene-containing solvents. It is that supplemental report which raises the most concern about Dr. Rose's methodology and calculations. In the second report, and shortly thereafter, in his deposition, Dr. Rose retreated from his previous reliance on the Driver references to a pure benzene exposure. Instead, he posited an "exposure assessment" which was said to have been based on the deceased's "cumulative occupational benzene exposure" from all of the employment tasks described over a 30-year span. (*See* Supplemental Report from Dr. Vernon E. Rose, Exhibit B–3 to Plaintiffs' Index, Docket Entry # 41). In his second report, Dr. Rose calculated that cumulative occupational exposure to have been 177 ppmyears. However, that calculation was amended about one month later following the realization that it was premised on an error. Dr. Rose acknowledged that, according to the exposure levels for cleaning parts with gasoline, that were recorded in his second report, Mr. Castellow not only would have encountered a contemporaneous exposure to gasoline in a potentially lethal amount, but also that such an exposure would have occurred twice daily, 250 days a year, for a ten-year period. (Deposition of Dr. Vernon E. Rose, Exhibit G to Defendants' Supplement to the Motion to Exclude, pp. 176–77). Testifying about this report, Dr. Rose conceded that such a level of benzene exposure, as calculated, with the inescapable simultaneous exposure to gasoline, appeared to be "very high", and gave him "pause" about the accuracy of his assessment.[4]

---

4.            Q: What would be the gasoline exposure

Indeed, that initial exposure assessment prompted another of Plaintiffs' own expert witnesses, Dr. Frank Gardner, to question its reliability and led to the third amendment to Dr. Rose's report. (*See* Deposition of Dr. Frank H. Gardner, Exhibit D–5 to Plaintiffs' Index, Docket Entry # 41, pp. 38–39).

In his third report, Dr. Rose estimated that Mr. Castellow met with 104 ppmyears cumulative occupational exposure to benzene. In this report, for the first time, Dr. Rose factored in the deceased's "background exposure" to benzene. Again, following questions about both his methods and results, that assessment was revised. In his fourth report, Dr. Rose calculated a cumulative occupational exposure to benzene of only 61 ppmyears. In tracing the chronology of his calculations, Dr. Rose conceded that his exposure assessment has changed 300% from the first to the final report. (Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, p. 132).

In calculating each of his exposure assessments in this case, Dr. Rose relied upon a "modeling" formula. Although Plaintiffs insist that the modeling technique is an acceptable scientific methodology and well suited to cases like this one, the court is not persuaded that the record supports that assertion when modeling is used to justify causation opinions in a tort claim. Plaintiffs have submitted a publication by the American Industrial Hygiene Association ("AIHA") in which modeling is described and advocated. Plaintiffs rely on that article, *Modeling Inhalation Exposure*, written by Michael A. Jayjock, Ph.D., to bolster Dr. Rose's reliance on that procedure in this matter. *See* Michael A. Jayjock, *Modeling Inhalation Exposure*, in THE OCCUPATIONAL ENVIRONMENT-ITS EVALUATION AND CONTROL 313 (Salvatore R. DiNardi ed., 1997). But the thrust of the article appears to herald the importance of a modeling approach to risk assessment, not to causation factors in the legal setting. The article describes the modeling ap-

be [sic]?

A: Right. About 59,000 parts per million.

Q: For five minutes?

A: Right.

Q: Twice a day under your analysis if the ambient temperature was 85 degrees?

A: Correct. Once in the morning and once in the afternoon.

Q: What would the effects—do you know what the effects of almost 60,000 ppm gasoline would be on someone over five minutes?

A: No, Sir, I don't. The only—and I haven't reviewed this literature for the—for purposes of this case. The only thing I have seen is—that I remember seeing in all this literature is Runion's paper—
\*\*\*
A: Yeah, I think so. He comes up with a range of—of five to 16,000 parts per million gasoline vapors as lethal in five—exposure time of five minutes.

Q: And it's your opinion, based on the assumptions you've made, that twice a day for a period of time equivalent to ten years for 250 working days a year during that ten-year period Mr. Castellow had those sorts of gasoline exposures; is that true?

A: I would say those would appear to be very high.

Q: It would have knocked him over right there, wouldn't it?

A: From the one reference, Reference 13, and there are—I'm sure there's more literature than this but I haven't looked at—there is a 1961 publication that is referred to. So, we have one publication that says that, that is correct.

Q: In fact, to be accurate, that publication says that a level less than a fourth of your estimate would have been lethal in one five-minute period, not two a day, 250 days a year, for ten year, true?

A: That's true.

Q: Do you have some information that Runion's acute gasoline exposure data—health effects of acute gasoline data are incorrect?

A: I have no other information whatsoever, one way or the other.

Q: Would that cause you some pause about the calculations you have made related to gasoline exposure while cleaning auto parts?

A: Yes, sir. I think if that—if that were a docu [sic]—an accepted level, it would. (Deposition of Dr. Vernon E. Rose, Exhibit G to Defendants' Supplement to the Motion to Exclude, pp. 177–78).

proach, in the context of inhalation exposure for occupational hygiene, in the following manner, as one

> investigating and seeking to understand the determinants of airborne contaminant source generation and control. As the critical variables governing the generation and control of airborne toxicants are discerned, the tools are formed that will build experience, knowledge-base, and confidence to predict actual concentrations and exposures in the real world with simulated scenarios.

> \*  \*  \*  \*  \*  \*

> Physical-chemical inhalation models are not limited to predicting present exposures. They can be used to estimate historical exposures that cannot easily be re-created and possible future exposures in hypothetical situations or scenarios. By employing a model, an occupational hygienist's insight about possible exposures is enhanced, even if the model is not perfectly accurate. A noted and wise statistician, G.W.E. Box, has been credited with the profound observation that "all models are wrong, but some are useful."

> \*  \*  \*  \*  \*  \*

> Thus, predictions from physical-chemical inhalation models can be extremely valuable; however, at this point these models are far from being considered elegant or complete. As such, they should be interpreted with caution and the usual judgment and intelligence that an occupational hygienist brings to his or her craft.

Michael A. Jayjock, *Modeling Inhalation Exposure*, in THE OCCUPATIONAL ENVIRONMENT-ITS EVALUATION AND CONTROL 313, 315 (Salvatore R. DiNardi ed., 1997).

In the same article, Dr. Jayjock points out that inhalation models do not estimate human exposure "directly", but instead estimate the concentration of toxicants in the air, and then

> assume[s] that the person is breathing the same air with this concentration.

The use of this and other assumptions is important and necessary in exposure assessment. . . . Indeed, it is vital to the integrity of the process to sort out and identify each and every assumption used in modeling and estimation of exposure.

Michael A. Jayjock, *Modeling Inhalation Exposure*, in THE OCCUPATIONAL ENVIRONMENT-ITS EVALUATION AND CONTROL 313, 316 (Salvatore R. DiNardi ed., 1997).

It is those very assumptions which Dr. Rose incorporated into his modeling formula that are so troubling in this case. Unfortunately, the discussion of Dr. Rose's calculations is complicated by the fact that the modeling formula that he relies on was developed by a non-testifying expert, Dr. Melvin Kopstein. (Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, pp. 131–35, 179–183; Deposition of Dr. Vernon E. Rose, Exhibit G to Defendants' Supplement to the Motion to Exclude, pp. 10–11).

Further, Dr. Rose acknowledged, as the Jayjock article suggests, that the model used in this case, and indeed the method as a whole, is intensely sensitive to a wide range of error depending on the exposure facts used in the modeling assumptions. (*See* Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, p. 168). This "sensitivity" is especially significant because Dr. Rose testified that he made adjustments to his calculations on the basis of interviews that he conducted with Mr. Castellow's former co-workers. He reported that, through these interviews, he was able to determine the exposures more accurately from their details about the deceased's typical workday habits. (Report from Dr. Vernon E. Rose, Exhibit B–4 to Plaintiffs' Index, Docket Entry # 41, p. 1; Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, pp. 166–67). But crediting those adjustments raises special concerns here for two reasons. It is clear that the original assessments of the workplace exposure were based on Mr. Driver's errone-

ous claim that pure benzene was used on a daily basis. It is easy to see that his statements on that topic, as amended at his deposition, had a critical impact on Plaintiffs' causation theories. This court is, therefore, reluctant to rely on calculations from Dr. Rose that are based on interviews which have not been verified. Second, Dr. Rose acknowledged, under cross-examination, that at every opportunity he ascribed a high number to a potential exposure scenario, even when a lower number, within a possible range, was more consistent with the facts, or even more credible. (Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, pp. 137, 144, 152, 155, 156–57, 167, 173, 177). For the same reason, it is impossible to endorse Dr. Rose's own assessment that his method is valid, and that any necessary adjustments can be made if the veracity of the factual data is questioned. See Black, 171 F.3d at 311 (5th Cir.1999). Even Dr. Rose agrees that "a careful scientist" using any chosen methodology must proceed from accurate information. (Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, p. 141). With due respect to Dr. Rose's training and experience, that "care" seems singularly lacking in his first three reports; that invites the inquiry on whether his final calculations bear sufficient indicia of reliability to present to a jury.

Defendants also criticize Dr. Rose's methods because he did not use, as the starting point for his calculations, the monitored exposure level data that is already available in the published literature. Instead, he resorted to modeling to calculate his "exposure assessment". The court is persuaded that the pertinent scientific literature, cited by Dr. Irons, does reflect studies of workers with duties akin to Mr. Castellow's, and that those studies contain comparable monitoring data. If comparable data from occupational exposure levels had been utilized, Dr. Rose's assessment would have been spared the scepticism that has greeted it. The fact that Dr. Rose's modeling calculations resulted in an estimated level of benzene exposure that would have resulted in simultaneous gasoline exposure at an explosive, if not lethally toxic, level underscores the unreliability of his selected methods. (See Transcript from hearing on July 26, 1999, Volume I, Docket Entry # 33, pp. 85–91). Indeed, Dr. Rose recognized the fallacy of this approach and later introduced a "decay curve" to adjust his original exposure assessment calculations to allow for injurious levels of gasoline to dissipate, and ostensibly, to create a more realistic workplace exposure scenario. (See Supplemental Report from Dr. Vernon E. Rose, Exhibit B–3 to Plaintiffs' Index, Docket Entry # 41). This adjustment illustrates the point that Dr. Irons made when he observed that modeling is not generally accepted as a substitute for data in a causation analysis. (See Transcript from hearing on July 26, 1999, Volume II, Docket Entry # 34, p. 143). As Dr. Irons noted,

> [m]odels are basically what people use in the absence of data. If you're going to project a risk in a regulatory setting that attempts or purports to characterize a risk that cannot be measured experimentally or with data, then modeling is the only thing you can do. It doesn't constitute evidence to use in determining causation. It's a policy, not a science.

(See Transcript from hearing on July 26, 1999, Volume II, Docket Entry # 34, p. 143). He also testified, and, in general, this court agrees, that "data that is used in arriving at [a] causal inference in a scientific setting requires data, not modeling." (See Transcript from hearing on July 26, 1999, Volume II, Docket Entry # 34, p. 143). Finally, Dr. Irons emphasized that any model

> that purports to use first principles to create data, I don't believe is very useful. I think invariably it is inaccurate. Having said that, one should then at least apply a check with respect to what is plausible and what's not. Does the model pass the laugh test? Does the

result that the model derives, is it compatible with life; is it compatible with anything else you physically can determine. If it doesn't, then it obviously is not appropriate.

(*See* Transcript from hearing on July 26, 1999, Volume II, Docket Entry # 34, pp. 143–44).

Although Dr. Rose testified to the assumptions that he made about the deceased's daily tasks in order to calculate his exposure assessment, it is clear that some of those are not supported in the evidence. (*See* Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, pp. 160–67). For instance, the assumptions Dr. Rose made in regard to Mr. Castellow's exposure to benzene from cleaning parts with gasoline is not based on anything in the record. (*See* Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, pp. 162–67). On cross-examination, it became obvious that there is no record support for the assumed time and exposure levels Dr. Rose assigned to this task. Rather, as he testified, it was based on "just my impression . . . of what the work situation was." (Transcript from hearing on August 16, 1999, Volume II, Docket Entry # 39, pp. 167). As even Dr. Rose admits that his modeling approach is extremely sensitive to fluctuations in data, it stands to reason that if the "data" from which his modeling assumptions arise is invalid, or non-existent, then there is no hope that his technique, much less his results, is going to be reliable.

Further, regardless of whether any of Dr. Rose's assessments, as set out in his June 22, July 21, or July 25, 1999, reports are accurate, none of those reports ascribe to Mr. Castellow a level of benzene exposure that has been shown to result in AML in human beings. In his June 22nd exposure assessment, Dr. Rose found that Mr. Castellow's workplace activities would have resulted in an exposure of 177 ppmyears of benzene. In his July 21st report, he calculated an exposure level of 104 ppmyears of benzene. And finally, his July 25th exposure assessment was calculated at 61 ppmyears of benzene. The court finds, however, that the relevant scientific/medical literature is conclusive only in documenting AML in human beings after benzene exposure levels reach beyond 200 ppmyears. *See* Mary B. Paxton et al., *Leukemia Risk Associated with Benzene Exposure in the Pliofilm Cohort: I. Mortality Update and Exposure Distribution,* 14 ANALYSIS 147 (1994); Otto Wong, *Risk of acute myeloid leukemia and multiple myeloma in workers exposed to benzene,* 52 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380 (1995); Elsebeth Lynge et al., *Risk of Cancer and Exposure to Gasoline Vapors,* 145 AMERICAN JOURNAL OF EPIDEMIOLOGY 449 (1997); Howard E. Runion, Benzene in Gasoline (1975) (unpublished study, Gulf Oil Corporation) (on file with the medical department of the Gulf Oil Corporation); Lesley Rushton and Helena Romaniuk, *A Case–Control Study to Investigate the Risk of Leukemia Associated with Exposure to Benzene in Petroleum Marketing and Distribution Workers in the United Kingdom,* 54 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 152 (1997); Otto Wong et al., *Health Effects of Gasoline Exposure. II. Mortality Patterns of Distribution Workers in the United States,* 101 ENVIRONMENTAL HEALTH PERSPECTIVES SUPPLEMENTS 63 (1993); Otto Wong et al., *Nested Case–Control Study of Leukemia, Multiple Myeloma, and Kidney Cancer in a Cohort of Petroleum Workers Exposed to Gasoline,* 56 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 217 (1999).

▮▮ Without question the burden is on the proponent of evidence to prove its admissibility. Moreover, mere assurances by an expert witness as to the accuracy of his own methods or results, in the absence of other credible supporting evidence, is insufficient. *Black v. Food Lion, Inc.,* 171 F.3d 308, 313 (5th Cir.1999). As the Fifth Circuit remarked recently, the "abuse of discretion review also governs a trial court's decision about how to determine

scientific reliability." *Black*, 171 F.3d at 310. In the *Food Lion* decision, Judge Jones commented that the *Kumho Tire* Court's emphasis on the word "may", in regard to the factors available for a trial court's consideration, "should not be misunderstood to grant open season on the admission of expert testimony by permitting courts discretionarily to disavow the *Daubert* factors." *Black*, 171 F.3d at 310. She reminded litigants that many kinds of experts, and expertise, are involved in the Rule 702 inquiry, and it is always a fact-specific one. In this matter, the court concludes that Dr. Rose's testimony "does not bear the necessary indicia of intellectual rigor", that is necessary under *Daubert*, to permit its admission before the jury. *See Black*, 171 F.3d at 312. The court concludes further that some of the purported "facts" which Dr. Rose used to develop his modeling calculations are not supported by the record. Moreover, the mathematical errors which required multiple amendments to his reports call into question the validity of his opinions and undermine the value of those calculations to a factfinder. Finally, the court concludes, from a review of Dr. Rose's methods, that his opinion here is derived from a process so dependent on assumption that it results in mere speculation as to a causal link between Mr. Castellow's lifetime work in a service station, and AML as a result of exposure to products made by Defendants Mobil and Gulf.

> [S]cientists whose convictions about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

*Claar v. Burlington Northern Railway Co.*, 29 F.3d 499, 503 (9th Cir.1994); *see also Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 783 (10th Cir.1999).

### *Opinion Offered by Dr. Marvin Legator*

Plaintiffs also named Marvin Legator, Ph.D., an environmental toxicologist, as an expert witness. Dr. Legator offered only one written opinion in this matter and it was rendered without the benefit of any assessment of the quantified level of exposure to benzene that Mr. Castellow might have experienced. (*See* Report from Dr. Marvin Legator, Exhibit B–2 to Volume II of Defendants' Exhibits in Support of the Motion to Exclude). In addition to that failing, in his report, Dr. Legator never assigns a level of exposure that has been documented in the medical literature to result in a statistically significant excess of AML cases. (*See* Report from Dr. Marvin Legator, Exhibit B–2 to Volume II of Defendants' Exhibits in Support of the Motion to Exclude).

### *Opinion Offered by Dr. Barry Levy*

In support of Plaintiffs' toxic tort claim, Dr. Barry Levy, an environmental health physician and epidemiologist, submitted two written opinions, a report dated January 26, 1999, and an affidavit, dated July 20, 1999. (Report and Affidavit from Dr. Barry Levy, Exhibits C–2, C–3 to Plaintiffs' Index, Docket Entry # 41). In his original report, Dr. Levy did not attempt to discuss the level of benzene exposure that has been reported in the available medical literature as likely to cause AML. In his amended report, submitted by affidavit, he clarified that the only quantitative information he had, in regard to Mr. Castellow's level of exposure, is that which he derived from Vernon Rose's calculations. (Affidavit from Dr. Barry Levy, Exhibit C–3 to Plaintiffs' Index, Docket Entry # 41, pp. 3, 6). Further, Dr. Levy's opinions were rendered without the benefit of Dr. Rose's final revisions, dated July 25, 1999. When Dr. Levy was deposed, he stated that he received information from Dr. Rose, verbally, on the quantitative exposure assessment. But it seems that the information from Dr. Rose was given six months after Dr. Levy's original report in which he expressed his opinion that Mr.

Castellow died from AML as a result of his exposure to benzene in the workplace. (Deposition of Dr. Barry Levy, Exhibit C–5 to Plaintiffs' Index, Docket Entry # 41, pp. 9–11).

In his own January 26th report, Dr. Levy opined that Mr. Castellow had "extensive" exposure to benzene and benzene-containing products throughout his work life. (Report from Dr. Barry Levy, Exhibit C–2 to Plaintiffs' Index, Docket Entry # 41, p. 3). It appears, however, that Dr. Levy's assessment was due, in part, on his reliance on Kenneth Driver's affidavit which erroneously described the deceased's work habits.

At his deposition, Dr. Levy conceded that, in a published study of workers exposed to pure benzene, the results showed a statistically significant rate of AML only among those workers who had been exposed to levels of benzene of 200 ppmyears and beyond. (Deposition of Dr. Barry Levy, Exhibit C–5 to Plaintiffs' Index, Docket Entry # 41, pp. 72–75). Dr. Levy also testified that if Mr. Castellow's actual cumulative benzene exposure level was lower than that calculated by Dr. Rose, then he could not state, with reasonable scientific probability, whether that putative exposure was the cause of Mr. Castellow's AML. (Deposition of Dr. Barry Levy, Exhibit C–5 to Plaintiffs' Index, Docket Entry # 41, pp. 122–24). Most importantly, Dr. Levy stressed that Dr. Rose's calculations were very important to him in forming his opinion about the quantitative exposure to which the deceased had been subject. (Deposition of Dr. Barry Levy, Exhibit C–5 to Plaintiffs' Index, Docket Entry # 41, pp. 9–11). Finally, Dr. Levy acknowledged that if Dr. Rose's calculations were inaccurate, so that Mr. Castellow was never, in fact, exposed to benzene at the levels calculated, then he could not offer an opinion as to causation. (Deposition of Dr. Barry Levy, Exhibit C–5 to Plaintiffs' Index, Docket Entry # 41, pp. 122–24).

It bears repeating that, at the time the expert witnesses, including Dr. Levy, gave their original reports, each was under the impression that Mr. Castellow used pure benzene, on a daily basis, to wash automotive parts. It seems that the bulk of Dr. Levy's original report was centered on that assumption. Moreover, although Dr. Levy reported that he had reviewed the medical literature in support of his opinion that Mr. Castellow's exposure history was consistent with benzene-induced AML, he was able to list only reports of benzene studies in which exposure levels were documented in workers other than service station attendants or mechanics. (Deposition of Dr. Barry Levy, Exhibit C–5 to Plaintiffs' Index, Docket Entry # 41, pp. 74–75). In fact, originally, Dr. Levy did not cite any studies that dealt with reports of gasoline exposure at all, and his first report did not attempt to quantify the level of gasoline exposure, or the benzene constituent in gasoline, that has been shown in the medical/scientific literature to lead to AML. (*See* Report from Dr. Barry S. Levy, Exhibit C–2 to Plaintiffs' Index, Docket Entry # 41).

### Opinion Offered by Frank Gardner

Plaintiffs named Frank Gardner, M.D., as an additional expert witness on the element of causation in their toxic tort claim. Before rendering his original report, dated January 20, 1999, Dr. Gardner had not received any information about the level of benzene to which Mr. Castellow may have been exposed in his worklife. Dr. Gardner, therefore, formed his opinion that Mr. Castellow's AML resulted from benzene exposure before he had reviewed any of Dr. Rose's reports, including the supplemental corrections to his original exposure assessment. Although Dr. Gardner testified, at his deposition, that he relied on evidence about Mr. Castellow's workplace exposure from the testimony and affidavits from co-workers, it seems reasonably clear that any information that he received from those sources cannot lend much retroactive support to his original

conclusion. (Deposition of Dr. Frank Gardner, Exhibit D-5 to Plaintiffs' Index, Docket Entry # 41, p. 11). Further, Dr. Gardner did not contest any of the scientific studies which reported no increased risk of AML among service station attendants exposed to benzene. (Deposition of Dr. Frank H. Gardner, Exhibit D-5 to Plaintiffs' Index, Docket Entry # 41, pp. 50-52). When offered the opportunity to do so, Dr. Gardner was unable to name any medical text which posits that gasoline exposure causes AML, nor was he able to cite any cohort mortality study in which individuals exposed to gasoline, including service station attendants, were found to have a statistically significant excess of AML, or leukemia cases, in general. (Deposition of Dr. Frank H. Gardner, Exhibit D-5 to Plaintiffs' Index, Docket Entry # 41, pp. 52, 141-42, 156). Finally, Dr. Gardner agreed that the IARC (International Agency for Research on Cancer), OSHA (Occupational Safety and Health Agency), and NIOSH (National Institute of Safety Hazards) have never published any findings which concluded that gasoline exposure, alone, is carcinogenic to human beings. (Deposition of Dr. Frank H. Gardner, Exhibit D-5 to Plaintiffs' Index, Docket Entry # 41, pp. 55-57).

Dr. Gardner did agree, however, that "severe" health effects could result from Dr. Rose's initial calculations of a gasoline exposure level of 10,000 ppm for five minutes, twice a day, over a work year. He also stated that, in his opinion, the acute effect of gasoline exposure of 59,000 ppm for five minutes would be lethal. (Deposition of Dr. Frank H. Gardner, Exhibit D-5 to Plaintiffs' Index, Docket Entry # 41, pp. 24, 27, 28).

Dr. Gardner is an experienced and qualified internist who is well versed in hematology and oncology. (Affidavit of Dr. Frank H. Gardner, Exhibit D-3 to Plaintiffs' Index, Docket Entry # 41, p. 1). The fact is, however, that his original report did not address any quantitative exposure on the part of Mr. Castellow, and that

absence makes his opinion of questionable value in assisting the jury on the issue of causation. (*See* Report from Dr. Frank H. Gardner, Exhibit D-2 to Plaintiffs' Index, Docket Entry # 41).

### *Expert Opinion from Dr. Myron Mehlman*

Once again, it appears that at the time that Myron Mehlman, Ph.D., made his report, in January 1999, he was operating under the erroneous assumption that Mr. Castellow habitually used pure benzene to wash automotive parts. Dr. Mehlman, a biochemist, who formerly served as director of toxicology and manager of environmental affairs for Mobil Oil, is eminently qualified in the relevant disciplines. (Curriculum Vitae of Dr. Myron Mehlman, Exhibit E-4 to Plaintiffs' Index, Docket Entry # 41). However, he concedes that when he wrote his first report, he had no quantitative information, at all, about the level of benzene, or gasoline, to which Mr. Castellow had been exposed during his employment and he was relying on the Driver affidavit. (Deposition of Dr. Myron Mehlman, Exhibit E-5 to Plaintiffs' Index, Docket Entry # 41, pp. 32-39). Further, at the time of his original report, and also at the time of his deposition, Dr. Mehlman was unable to provide any scientific references that document the level of exposure to gasoline that can cause AML. In fact, during his deposition, Dr. Mehlman was not able to cite any epidemiological cohort mortality studies in which the authors had concluded that gasoline exposure, at any level, led to AML. (Deposition of Dr. Myron Mehlman, Exhibit E-5 to Plaintiffs' Index, Docket Entry # 41, p. 42).

Q: Can you name a single study in which the investigators or authors have concluded that gasoline causes acute myelogenous leukemia?

A: I haven't searched for that yet, but I will do that.

Q: So as we sit here today, you cannot name a single scientific study in which the authors or investigators concluded that gasoline causes

acute myelogenous leukemia in humans; is that true?

A: At the moment, that's true, but I haven't searched for that.

(Deposition of Dr. Myron Mehlman, Exhibit E–5 to Plaintiffs' Index, Docket Entry #41, p. 43). Later in his testimony, Dr. Mehlman did cite one study, but conceded that it did not report a statistically significant excess rate of leukemia in persons exposed to gasoline, but instead, a statistically significant rate of excess for kidney cancer. (Deposition of Dr. Myron Mehlman, Exhibit E–5 to Plaintiffs' Index, Docket Entry #41, p. 44). Further, Dr. Mehlman acknowledged that, to the extent that there was any reliance on European studies of workers exposed to the benzene component of gasoline, European gasoline generally contains a higher percentage of benzene than that in the United States. (Deposition of Dr. Myron Mehlman, Exhibit E–5 to Plaintiffs' Index, Docket Entry #41, p. 47). In sum, it is obvious that Dr. Mehlman rendered his opinion in the case without any information about the amount of benzene to which Mr. Castellow had been exposed from his lifetime work around gasoline.

### Conclusion

Plaintiffs here have not shown that the relevant scientific or medical literature supports the conclusion that workers exposed to benzene, as a component of gasoline, face a statistically significant risk of an increase in the rate of AML. Further, there is no reliable evidence before this court on the amount of benzene, from gasoline or any other source, to which Mr. Castellow was exposed. In this case, given the

> paucity of facts [Dr. Rose] had available about the level of [Castellow's] exposure to [benzene-containing gasoline], his causation opinion would have been suspect even if he had scientific support for the position that the [gasoline] solution could cause [AML] in a worker exposed to some minor level of the [substance].

Under *Daubert*, "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."

*Moore*, 151 F.3d at 279 n. 10 (quoting *In re Paoli R.R. Yard P.C.B. Litigation*, 35 F.3d 717, 745 (3rd Cir.1994)). Just months ago, the Fifth Circuit addressed a similar question on whether a jury should hear an expert witness's opinion on the matter of causation in a toxic tort case. *See Curtis*, 174 F.3d at 661. In *Curtis*, the witness testifying on the causal link to the offending product relied on the following evidence in rendering his opinion: the "cluster" of symptoms that multiple workers experienced shortly after exposure to the contaminant; the results of Draeger tube tests performed by workers at the site (the particular tubes used were designed to measure more then 10 ppm of contaminant and were pumped only twice before saturation); statements by current refinery workers about daily tasks which involved exposure to the contaminant, and the design of the refinery itself. *See Curtis*, 174 F.3d at 670–71. Significantly, the industrial hygienist in *Curtis* did, in fact, have data from a monitoring system available to him, data that is not available here. For that reason, the Fifth Circuit disagreed with the trial judge's decision to exclude the expert opinion on causation factors related to current and former employees. However, the trial judge's decision to exclude the hygienist's causation testimony in regard to other claimants, for whom there was no documented exposure data, was affirmed. As to those claimants, the Fifth Circuit found that "the critical causation element is not supported by credible evidence." *See Curtis*, 174 F.3d at 676.

In contrast, as discussed earlier, Dr. Rose's reliance on statements by the deceased's former co-workers to develop an "exposure assessment" is overstated and often unfounded. (*See* Deposition of Kenneth Driver, Exhibit H to Defendants' Mo-

tion to Exclude; Affidavit of Kenneth Driver Exhibit I to Defendants' Motion to Exclude; Deposition of Joseph Smith, Jr., Exhibit B to Defendants' Reply; Affidavit of Joseph Smith, Jr., Exhibit A–3 to Plaintiffs' Response to the Motion to Exclude; Affidavit of David E. King, Exhibit A–1 to Plaintiffs' Response to the Motion to Exclude; Affidavit of James Teague, Exhibit A–2 to Plaintiffs' Response to the Motion to Exclude). Further, what Dr. Rose characterizes as the "detailed investigation" on which he relied, is simply a drawing which purports to reproduce one of the deceased's former work sites, a drawing that was prepared by an investigator for Plaintiffs' attorney, presumably from recollections by those former employees. (Deposition of Dr. Vernon E. Rose, Exhibit G to Defendants' Supplement to the Motion to Exclude, pp. 104–05).

Indeed, even more recently, in *Munoz v. Orr*, 200 F.3d 291 (5th Cir.2000), the trial judge rejected, as unreliable, evidence proffered from a designated expert witness. Among the reasons cited for its exclusion was the court's finding that the witness's evidence was "insufficient". *See Munoz*, 200 F.3d at 291. That insufficiency was noted to "range from particular miscalculations to his general approach to the analysis." On appeal, the Fifth Circuit observed that there was no satisfactory explanation given for the errors in calculation and that any reliance on information produced in that manner was misplaced. The court found further that the trial judge was justified in rejecting the expert's opinion after it was determined that his methods were not "in accord with" recognized experts in his field. *See Munoz*, 200 F.3d at 301 (citing *Kumho Tire*, 119 S.Ct. at 1176). "The objective of [the gatekeeping requirement] ... is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 119 S.Ct. at 1176.

After a thorough review of all of the testimony, exhibits, and supplements, the court is led to the inescapable conclusion that the opinions from the expert witnesses in this case are unreasonably dependent on speculation about the cause of Mr. Castellow's AML. The court finds further that Dr. Rose's exposure assessment is not based on adequate data, but instead was devised to support a causation opinion without reliable bases to do so. His methodology, therefore, is not reliable and his testimony is inadmissible. In the absence of sufficient, accurate information of exposure levels, his opinion is nothing more than speculation. Such result-driven procedures are anathema to both science and law and are properly excluded because they are too speculative to assist the triers of fact in determining the cause of Mr. Castellow's illness. In addition, the court finds that the other expert witnesses, eminently qualified as each is in his own field, depend on Dr. Rose's exposure level calculations to provide the causal link to Defendants' products. That causal link fails. In that regard, the court has come to the reluctant conclusion that Defendants are correct when they state that "Plaintiffs' experts have worked backwards from the exposure conclusion they needed." (Defendants' Supplement to the Motion to Exclude, p. 9). In making that assessment, the court is not, as Plaintiffs argue, requiring them to produce a "precise level" of benzene exposure. Instead, the court is merely requiring them to produce information, adequately supported, from which Dr. Rose, and the others, can make a causal connection.

Rule 702 "contemplates some degree of regulation of the subjects and theories about which an expert may testify", and that testimony must be based on a reliable foundation. *Moore*, 151 F.3d at 275; *Kumho*, 119 S.Ct. at 1174. Because of the unique effect of an expert witness's appearance and the advantageous position he holds at trial, the proponent of the evidence must demonstrate that "the principle supports what it purports to show."

*United States v. Posado,* 57 F.3d 428, 433 (5th Cir.1995). This is the only means to insure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 119 S.Ct. at 1176; *see Garcia v. Columbia Medical Ctr. of Sherman,* 996 F.Supp. 617, 620 (E.D.Tex.1998) (noting that reliability requirement insures that knowledge offered is "supported by appropriate validation" and "establishes a standard of evidentiary reliability"). Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be based on "good grounds" and that the testimony be "more than speculative belief or unsupported speculation." *Posado,* 57 F.3d at 433 (citing *Daubert,* 509 U.S. at 589–90, 113 S.Ct. 2786).

From the record, as a whole, the court concludes that the proffered testimony fails scrutiny under *Daubert.* Plaintiffs' theory that Mr. Castellow developed AML as a result of "cumulative exposure" to benzene-containing gasoline is not supported by the relevant scientific or medical literature. The pertinent studies show that persons exposed to gasoline, by occupation, do not reflect a statistically significant excess rate of AML, or even leukemias generally. Insofar as Plaintiffs hope to establish a causal link by calculating a risk of exposure consistent with the medical literature, the reliance on Dr. Rose's formula is misplaced. In the absence of credible evidence that Mr. Castellow was exposed to quantities of benzene that are sufficient to result in AML, Dr. Rose's speculative opinions will not suffice to sustain Plaintiffs' burden. After a careful review, the court concludes that Dr. Rose's testimony is not reliable and should not be presented to the jury, backed as it will be, by his estimable credentials as a well trained and long-experienced industrial hygienist. It bears repeating that the gatekeeping function, which precedent imposes on this court, requires

some objective independent validation of the expert's methodology. The expert's assurances that he has utilized generally acceptable scientific methodology is insufficient. The proponent need not prove to the judge that the expert's testimony is correct, but ... must prove by a preponderance of the evidence that the testimony is reliable.

*See Moore,* 151 F.3d at 276 (citations omitted).

The court finds, therefore, that the opinions offered by Plaintiffs' expert witnesses are not reliable as they posit a theory that is not generally accepted (exposure to gasoline causes AML); that their particular hypothesis in this case has not been subjected to testing or peer review; and most importantly that, here, the result driven methodology (modeling to determine exposure assessment) is rife with error and speculation. For all of those reasons, the proffered opinions do not meet the *Daubert* standard and they should be excluded. Based on the discussion herein, the court GRANTS Defendants' motion to exclude the testimony offered by Levy, Gardner, Legator, Mehlman and Rose. Absent any evidence to establish a causal link between Mr. Castellow's death and Defendants' products, Plaintiffs' evidence fails and the case is subject to summary judgment. By separate order, that motion is also GRANTED.

The Clerk shall enter this order and provide a true copy to all counsel of record.