COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| ISKANDIA ENERGY OPERATING, INC., | § | No. 08-22-00103-CV |
| Appellant, | § | Appeal from the |
| v. | § | 143rd Judicial District Court |
| SWEPI LP d/b/a SHELL WESTERN E&P, | § | of Loving County, Texas |
| Appellee. | § | (TC# 20-06-991) |

**O P I N I O N**

Appellant Iskandia Energy Operating, Inc. (Iskandia), brings this appeal from the trial court's orders excluding two of its expert witnesses and granting a no-evidence motion for summary judgment. The trial court rendered a take-nothing judgment in favor of SWEPI LP d/b/a Shell Western E&P on Iskandia's trespass claim for damages to its mineral interest based on subsurface saltwater migration. For the reasons that follow, we reverse the trial court's orders and remand this case for further proceedings.

**BACKGROUND**

**A. Factual background[1]**

Iskandia is an oil and gas operator specializing in producing oil from older reservoirs. Along with its non-operating working interest owner, Iskandia owns rights to develop oil and gas

---

[1] Our summary of the facts is taken from Iskandia's pleaded claims as presented in its lawsuit.

through mineral leases in the South Dimmitt Field of Loving County, Texas. Its leases granted Iskandia the right to explore and produce from the geologic formation known as the Delaware Mountain Group (DMG) in the Delaware Basin lobe of the Permian Basin. SWEPI is also an oil and gas operator, and it too has development rights in the area.

Relevant to this appeal, the parties' production activity in the Delaware Basin takes place in three hydrocarbon-bearing formations: a shallow layer, a mid-section, and a deeper layer. Iskandia operates in the DMG, a shallower layer of the geologic series. SWEPI produces from deeper intervals known as the Wolfcamp and Bone Springs layers.

Iskandia purchased its oil and gas leases in early 2017. The leases covered more than 5,000 acres in Loving County and included over 100 producing oil wells. The company planned on rehabilitating certain wells by using re-stimulation technologies to increase their production. Iskandia claims it expected to earn a substantial return on its investment. After acquiring those leases, it spent additional funds to work over a substantial number of the wells and its general ownership of the field. It further expected to earn a substantial return from those enhancements.

The parties acknowledge that oil and gas production is accompanied by production of large volumes of saltwater,[2] which must be disposed in an environmentally safe way.[3] Iskandia described that, over the years, area operators disposed of their waste saltwater back to the producing formation through saltwater injection wells. Since acquiring its leases, Iskandia claimed it had produced less than 6,000 barrels of saltwater per day. It notes that it disposed of this volume

---

[2] The parties' briefing refers to the water produced along with oil and gas alternatively as "saltwater," "brine," "produced water," and "oil and gas waste." Although we recognize the Merriam-Webster dictionary says "saltwater" in its compound form is more commonly used as an adjective and less commonly as a noun, we will follow the parties' lead and use the compound form of this word to identify this substance. *See* Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/saltwater (2023).

[3] The Injection Well Act, Chapter 27 of the Texas Water Code, governs the permitting, drilling, and use of injection and disposal wells through which the majority of this saltwater is disposed. *See* TEX. WATER CODE ANN. §§ 27.001-.207.

of water by injecting it back into the DMG formation at a 1:1 ratio. By replacing the saltwater in this balanced ratio, it claimed it maintained the formation pressure at the right equilibrium to assist future production.

Iskandia alleges, however, that SWEPI has not been injecting its waste back into its own producing area. Rather, it claims that SWEPI disposed of its saltwater waste into Iskandia's producing area. It contends that SWEPI was producing more than 110,000 barrels of saltwater per day from the Bone Springs and Wolfcamp formations as of December 2019. By disposing of exponentially more saltwater than the area could accommodate without adverse effects, Iskandia claims that SWEPI was "swamping" Iskandia's oil reserves with its waste, in some cases forcing saltwater to spill over the top of the wellheads, which made the oil reserves economically unrecoverable. Iskandia contends that, as SWEPI disposed of more and more saltwater, the contamination of its producing area continued to spread over wider areas, adversely affecting its wells. It blamed SWEPI for a precipitous drop in oil production from the affected wells and the wider producing zone, resulting in economic damages.

## B. Procedural background

In June 2020, Iskandia sued SWEPI alleging various causes of action. At the time of the summary judgment, Iskandia's live petition brought claims for private nuisance, negligence, and trespass, alleging that SWEPI's injection of waste saltwater into Iskandia's producing zones, as opposed to its own producing zones, constituted a continuing trespass on its property and mineral rights.[4] "For example," it claimed, "SWEPI's trespass violates, among other things, [Iskandia's] right of exclusive possession of its property, its right not to have its producing reservoir polluted by SWEPI's waste, and its legal rights to explore, obtain, produce, and possess minerals under its

---

[4] Iskandia's summary judgment response declared that it had no intention of pursuing its causes of action for nuisance and negligence. Thus, it had filed a notice of partial nonsuit of those claims from its case.

oil and gas leases." Iskandia sought recovery for damages to its mineral estate and property rights caused by "SWEPI's ongoing disposal of massive quantities of salt water[.]"

After an adequate time for discovery, SWEPI moved for a no-evidence summary judgment challenging Iskandia's trespass claim. Generally, it urged that Iskandia had no evidence that: (1) SWEPI intentionally and voluntarily entered or caused any entry into Iskandia's wells; or (2) that any alleged trespass caused injury to Iskandia's right of possession. SWEPI followed its motion for summary judgment with separately filed motions to exclude two of Iskandia's experts, D. Nathan Meehan, Ph.D., P.E., and Ambinintsoa "Bintu" Randriamampandry.

Iskandia proffered Dr. Meehan for the purpose of establishing causation and damages. In formulating his opinions, Dr. Meehan engaged the services of FracMod, a Canadian reservoir simulation consulting company. Bintu, a professional geologist and employee of FracMod, developed a computer-generated, static 3D subsurface model of the relevant geological formations. A second FracMod employee then used the subsurface model to assist Dr. Meehan in performing reservoir simulations to predict the flow of SWEPI's injected saltwater through the formations. Dr. Meehan produced an expert report, and his report and depositions of both experts are part of the record and were the focus of the no-evidence summary judgment motion and the motions to strike.

A fair summary of Dr. Meehan's causation testimony is that the high-pressure, high-volume saltwater SWEPI injected into the DMG formation migrated onto Iskandia's leases and adversely affected the production potential of Iskandia's wells. Dr. Meehan opined that SWEPI's injected saltwater damaged 15 of Iskandia's wells beyond repair, negatively impacted another 18, and would damage an additional 50 wells beyond repair should SWEPI's injection disposal continue. Dr. Meehan estimated Iskandia's resulting damages to be $29.9 million.

After holding a hearing on the dispositive motion and the motions to exclude expert witnesses, the trial court granted SWEPI's motion for summary judgment and issued orders excluding both of its experts, all on the same date. Iskandia subsequently appealed all three orders.

## ISSUES ON APPEAL

Iskandia raises three issues on appeal. In its first two issues, Iskandia complains that the trial court erred in excluding the testimony of its expert witnesses, Dr. Meehan and Ambinintsoa "Bintu" Randriamampandry, respectively. In its third issue, Iskandia asserts the trial court improperly granted SWEPI's no-evidence summary judgment motion. We address each issue in turn.

## ADMISSIBILITY OF EXPERT TESTIMONY

### A.   Standard of review

We review for an abuse of discretion a trial court's exclusion of an expert witness's testimony. *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). An abuse of discretion occurs when a trial court fails to follow guiding rules and principles. *Id.*

When the trial court does not specify the ground on which it excludes expert testimony, as here, "we affirm the trial court's ruling if any ground is meritorious." *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam). If an expert's testimony is relevant and based on a reliable foundation, a trial court abuses its discretion in excluding it. *State v. Cent. Exp'way Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). Conversely, a trial court's admission of expert testimony that is not reliable is an abuse of discretion. *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 73 (Tex. 2023).

### B.   Applicable law

Texas Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. An expert's testimony regarding scientific, technical, or other specialized matters is admissible if the expert is qualified, and the opinion is relevant, reliable, and based on a reliable foundation. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009).

## C. Analysis

### (1) Dr. Nathan Meehan's testimony

In its first issue, Iskandia urges that the trial court erred in excluding the testimony of Dr. Nathan Meehan. In the court below, SWEPI claimed in a series of arguments that Dr. Meehan's testimony as to both causation and damages should be excluded because he was not qualified, his testimony was based on unreliable foundational data and flawed methodology, and he failed to rule out plausible alternative causes of the damage to Iskandia's wells. On appeal, it appears that SWEPI has abandoned its objection to Dr. Meehan's qualifications. Nonetheless, because that issue was argued below, and the trial court did not state its grounds for excluding Dr. Meehan's testimony, we will briefly address his qualifications and then consider SWEPI's remaining arguments. *See K-Mart*, 24 S.W.3d at 360.

### (a) Qualifications

SWEPI argued that Dr. Meehan was neither qualified to opine on geology, because he is not a geologist; nor qualified to testify as to damages, because he is not an appraiser, an economist, or an accountant. We disagree.

An expert witness's qualifications may be based on knowledge, skill, experience, training, or education. TEX. R. EVID. 702; *Helena Chem.*, 664 S.W.3d at 73.

Dr. Meehan has a Ph.D. in petroleum engineering from Stanford University. He has taught graduate-level courses in oilfield development and coordinated projects in well completion/stimulation, reservoir characterization, and well testing. He has over three decades of experience working as a petroleum engineer to include consulting or advising on reservoir stimulation and waterflooding. His experience also includes well completion, reservoir simulation and characterization, well testing, waterflooding, and geostatistics. Although Dr. Meehan is not a geologist, he has taken numerous geology classes at the bachelor's, master's, and Ph.D. level of academics.

In addition, Dr. Meehan has appraised oil and gas assets for decades, throughout his career. He has written and studied technical writings on valuing oil and gas assets, including authoring the economics chapters in a textbook. He has managed oil and gas companies and energy contractors and has analyzed oil and gas economics in the positions of executive and director at numerous oil and gas companies, energy contractors, and consulting firms.

A petroleum engineer's expertise in geology may be sufficient to allow him to testify as to matters of petroleum geology. *See Discovery Operating, Inc. v. BP Am. Prod. Co.*, 311 S.W.3d 140, 151 n.6, 169 (Tex. App.—Eastland 2010, pet. denied). Similarly, petroleum engineers with sufficient experience also testify as to damages in oil and gas disputes. *See, e.g.*, *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 715–16 (Tex. 2016). Based on his knowledge, skill, experience, training, and education, the record established Dr. Meehan was qualified to testify as an expert witness as to causation and damages regarding Iskandia's trespass cause of action. *See* TEX. R. EVID. 702; *Helena Chem.*, 664 S.W.3d at 73. The trial court would have abused its discretion in excluding Dr. Meehan's testimony based solely on his qualifications.

### (b) Reliability

SWEPI argued Dr. Meehan's testimony was unreliable because the geological and reservoir simulation models he relied on to form his opinion were based on flawed data and methodology; the models themselves did not meet reliability standards and are not used in any other context by Iskandia; and Dr. Meehan failed to rule out plausible alternative causes of the damage to Iskandia's wells. After a recitation of the law on reliability of expert testimony, we address each of SWEPI's arguments in turn.

"[E]xpert testimony on scientific matters . . . must be grounded in the methods and procedures of science." *Helena Chem.*, 664 S.W.3d. at 73 (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995)). An expert offering only her credentials and a subjective opinion is of no assistance to the jury because her testimony is fundamentally unsupported. *Id.* (quoting *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 801 (Tex. 2006)). A determination of reliability of expert testimony includes consideration of whether the expert's methods are grounded in science and whether the foundational data are reliable. *Id.* at 73–74. "[A]n expert's conclusions must have a reliable basis other than the expert's say-so." *Id.* at 73. Expert testimony that contains no more than subjective belief or unsupported speculation is unreliable, conclusory, of no assistance to the jury, and not probative evidence. *Id.* In addition, if there is "too great an analytical gap between the data and the opinion proffered[,]" an expert's testimony is unreliable. *Id.* at 74 (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998)). "Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached." *Id.* (quoting *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015)).

The Supreme Court of Texas has set out six nonexclusive factors, in addition to the expert's experience, that a trial court may consider in determining whether expert testimony is reliable:

1. the extent to which the theory has been or can be tested;

2. the extent to which the technique relies upon the subjective interpretation of the expert;

3. whether the theory has been subjected to peer review and/or publication;

4. the technique's potential rate of error;

5. whether the theory or technique has been generally accepted as valid by the relevant scientific community; and

6. the non-judicial uses which have been made of the theory or technique.

*Id.*at 74 (citing *Robinson*, 923 S.W.2d at 557).

A trial court is not to second-guess "the correctness of the expert's conclusions;" it should only examine "whether the analysis used to reach those conclusions is reliable." *Wilson v. Shanti*, 333 S.W.3d 909, 913 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A trial court is "not permitted to determine reliability based on the weight of the evidence[.]" *Id.*

### (i) Causation

#### a. The methodology and foundational data

In his expert report, Dr. Meehan opined that SWEPI's high-volume, high-pressure saltwater injection damaged Iskandia's wells and will continue to damage its wells into the future. Dr. Meehan provided a two-page list of materials he considered in forming his opinion, as well as the methodology behind producing the reservoir simulations on which his conclusions were based. Dr. Meehan explained that data was provided to FracMod for the purpose of producing the subsurface model and performing the reservoir simulations upon which he relied.

As referenced above, the testifying and consulting experts from FracMod, in conjunction with Dr. Meehan, developed a computer-generated 3D subsurface model of the geological

9

formations at issue and used this subsurface model to run reservoir simulations to predict the flow of SWEPI's injected saltwater through the formations. More specifically, inputting actual, recorded data obtained from Iskandia, SWEPI, and publicly available sources, Bintu utilized Petrel software to create a geological subsurface model estimating the nature and quality of the reservoir at issue, including the thickness, lateral extent, structure, and porosity of the DMG production zone. Bintu then passed the subsurface model to Gurpreet Sawhney, another FracMod employee and Iskandia's consulting expert, who, in conjunction with Dr. Meehan, used the subsurface model, populated with additional data (e.g., fluid properties, well completion and production information, and pressure characteristics), and tNavigator software to perform computer-generated reservoir simulations to demonstrate how saltwater moves in the formations at issue. The appearance of this subsurface water movement in the simulation output is sometimes referred to as an injection or tracer "plume."

Reservoir simulations are used to predict the flow of liquid or gas through porous media, like the movement of SWEPI's injected saltwater through the subsurface geological formations at issue here. *See N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). Reservoir simulations have been used in the oil and gas industry, and in litigation, for decades. *See Texaco, Inc. v. R.R. Comm'n of Texas*, 583 S.W.2d 307, 310 (Tex. 1979); *Pogo Producing Co. v. United Gas Pipe Line Co.*, 511 So.2d 809, 814 (La. Ct. App. 1987); *Louisiana Land and Expl. Co. v. Wyoming Oil & Gas Conserv. Comm'n*, 809 P.2d 775, 776 (Wyo. 1991); *Anadarko E&P Co., L.P. v. R.R. Comm'n of Texas*, No. 03-04-00027-CV, 2009 WL 47112, at *14 (Tex. App.—Austin Jan. 7, 2009, no pet.) (mem. op.). Petrel is "a Microsoft Windows-based software application for 3D visualization, 3D mapping, and 3D reservoir modeling." *Dynamic 3D Geosols., LLC v. Schlumberger Ltd.*, No. A-14-CV-112-LY, 2015 WL 4578681, at *1 (W.D. Tex. Mar. 31, 2015), *aff'd*, 837 F.3d 1280 (5th Cir. 2016).

Dr. Meehan testified that the Petrel geomodeling and tNavigator reservoir-simulation software programs are well-accepted and routinely used within the scientific community and in the industry, much more for business decisions than for litigation support. Likewise, he testified that the tNavigator software is used by major oil companies, midsize companies, universities, and research groups. *See Robinson*, 923 S.W.2d at 557 (general scientific acceptance and non-judicial use are factors indicating reliability).

On this record, then, we conclude that Dr. Meehan established that the Petrel and tNavigator programs, along with the techniques of geomodeling and reservoir simulation, are generally accepted as valid by the relevant scientific community and are used non-judicially in the business and academic communities. Moreover, SWEPI concedes on appeal that the tNavigator and Petrel programs can produce reliable models under certain circumstances and with adequate and accurate underlying data.[5] Rather than disputing the reliability of reservoir simulation or the programs themselves, SWEPI argues instead that Dr. Meehan's inability to explain deficiencies in the model and his purported failure to demonstrate how the model proved causation renders inadmissible his testimony based on the reservoir simulation. SWEPI's complaints center around difficulties Dr. Meehan had in performing live a reservoir simulation during his deposition. Citing no caselaw as authority, SWEPI argues that an expert presenting a computer simulation must be able to "walk the court through the entire process" of the simulation itself. We disagree.

The Texas Rules of Civil Procedure specifically provide that a testifying expert may rely on the work product of a consulting expert. TEX. R. CIV. P. 192.3(e). Dr. Meehan was directly involved with the development of the reservoir simulation, beginning from his review and incorporation of relevant data to his reaching conclusions based on the results produced from the

---

[5] In a similar situation, the Supreme Court of Texas recognized in *Helena Chemical* that use of a model to predict herbicide drift would be useful in proving crop exposure to toxic chemicals. *Helena Chem.*, 664 S.W.3d at 77-78.

simulations. Although Dr. Meehan was designated as the testifying expert on the issue of causation, both Bintu, who created the geologic Petrel model, and Sawhney, who ran the tNavigator reservoir simulations using Bintu's geologic model, were designated as expert witnesses as well, and SWEPI deposed both of them. Further, the reservoir simulation and Dr. Meehan's report were produced to SWEPI, whose own expert witnesses thoroughly critiqued both Dr. Meehan's methodology and his conclusions. We will address SWEPI's concerns about the data underlying the geologic model and the simulation below, but we cannot say on this record that the methodology of both geologic models and reservoir simulations in general, and of those produced here, were not reliable as a matter of law. Importantly, Dr. Meehan's reliance on consulting experts for the purpose of producing the reservoir simulation model is an anticipated manner of producing expert testimony under the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 192.3(e).

With respect to the foundational data underlying the model and simulation, Dr. Meehan testified that the largest volume of data he used as input for the model came from the Railroad Commission of Texas, including oil and water production data, with additional data coming from published permeability correlations; the Nance paper, an industry standard; temperatures calculated from log data; and data from Iskandia and SWEPI wells. That data was then modified using history matching—a comparison of forecasts generated by an expert's methods to actual results—which Dr. Meehan testified is a standard industry practice when developing reservoir simulations. *See, e.g.*, *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 713 (Tex. App.—Fort Worth 2015, no pet.). Dr. Meehan testified that history matching is the principal manner in which operators and people doing modeling do to verify matches, and SWEPI's experts stated the same. *See Robinson*, 923 S.W.2d at 557 (general scientific acceptance and non-judicial use are factors indicating reliability).

12

SWEPI asserted the geologic model was based on insufficient porosity and pressure data. Specifically, SWEPI complained that the reservoir simulation included only a dozen pressure readings, fifty porosity readings, one production log with relative permeability data by layer, and two wells with core data. Dr. Meehan testified that he had fifty-five porosity logs, calculations foot-by-foot, for the entire lengths of the wells. He took this information along with published data on permeability and porosity and calculated permeability as a function of porosity using the Stones Model, a set of equations that calculate relative permeabilities for oil and water as a function of water saturation. Once the reservoir simulation was completed, Dr. Meehan tested it by doing extensive history matching. Dr. Meehan stated that the number of pressure readings he used, combined with other data points, were sufficient for him to form an opinion based on reasonable certainty.

SWEPI also contended the reservoir simulation is unreliable because it did not incorporate a facies model. While recognizing that Dr. Meehan determined that using a facies model was impractical at this scale, SWEPI argues that the lack of a facies model invalidates Dr. Meehan's results using a conventional geologic model.[6] In response to SWEPI's concerns, Dr. Meehan refined the conventional geologic model he used to better account for the factors that concerned SWEPI about not using a facies model, but Dr. Meehan ultimately concluded that using a conventional model would not qualitatively affect the porosity or permeability distributions.

Lastly, SWEPI argued the data was manually manipulated when the reservoir simulation would not work as desired. It complains that Dr. Meehan inserted artificial depths for certain well bores because they were not being read by the model. Bintu clarified, however, that it was the well tops, not the depths, that would have any effect on the simulation's outcome.

In short, SWEPI's arguments regarding Dr. Meehan's foundational data either mischaracterize the testimony (e.g., complaining of well depths when testimony indicates it is the well tops that matter,

---

[6] Dr. Meehan described a facies model as a subsurface model that introduces geologic bias, that is, incorporates geological information other than hard data. A facies-type model would "try to characterize the types of sand bodies, whether they're levies, channels, et cetera."

complaining of only fifty cross-sectional readings when each of those wells actually had "hundreds, if not thousands" of cross-sectional readings) or attack the accuracy of his results (e.g., claiming that using additional data would allow for modeling that "would be potentially more accurate"). Given that Dr. Meehan's testimony was based on data obtained from well logs and government sources, among other materials, we do not find these arguments persuasive.

In a final critique, SWEPI contends Dr. Meehan's numerous revisions of his report over the course of indicates his opinion lacked reliability. Specifically, it argues his revisions showed the reservoir simulation shifted in a "dramatic manner," and these shifts were due to "busts in the model," which were not caught earlier. SWEPI cites *Castellow v. Chevron USA*, 97 F.Supp. 2d 780 (S.D. Tex. 2000), a benzene exposure case in which the court excluded an expert who repeatedly revised a report. The federal district court in *Castellow* was critical of the expert's chosen modeling approach to establish causation. *Id.* at 789–90. The court further determined that some of the facts used to support the expert's modeling calculations were not supported by the record and mathematical errors required multiple amendments to his report. *Id.* at 793. Here, however, we have not been presented with alleged mathematical errors in the models; rather, SWEPI's attacks on the third reservoir simulation again refer to a portion of Dr. Meehan's deposition in which he admitted he was having trouble getting the simulation to perform as he expected in that instance while engaged in a live demonstration. At no point, however, does the record reflect that Dr. Meehan withdrew his opinion in its entirety based on what transpired at the deposition.

Absent other factors demonstrating a lack of reliability, we decline to adopt a position that an expert's testimony is unreliable and inadmissible simply due to changes made in subsequent revisions. *See Shaw v. Triple J Mowers, Inc.*, No. 10-04-00262-CV, 2006 WL 348427, at *5 (Tex. App.—Waco Feb. 15, 2006, no pet.); *Simpson v. Baronne Veterinary Clinic, Inc.*, 803

F.Supp.2d 602, 608 (S.D. Tex. 2011). As the Supreme Court of Texas has noted, "[o]ur rules do not prevent experts from refining calculations and perfecting reports through the time of trial." *Exxon Corp. v. W. Texas Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993).

b. <u>Accounting for plausible alternative causes</u>

SWEPI also argues that Dr. Meehan's testimony is unreliable because he failed to rule out plausible alternative causes. Indeed, an expert weighing in on causation does shoulder a burden to account for plausible alternative causes, which must be excluded with reasonable certainty. *Helena Chem.*, 664 S.W.3d at 80. An expert's failure to rule out plausible alternative causes renders their opinion "little more than speculation." *Id.* (quoting *Robinson*, 923 S.W.2d at 559). "[T]he analysis of alternative causes must be sufficient for the factfinder to reasonably conclude that the defendant's conduct was a 'substantial factor' in causing the injury." *Id.* Of note, the testimony regarding plausible alternative causes need only account for plausible alternative causes raised by the evidence. *Id.*

SWEPI claimed the evidence indicated Iskandia may have caused its own injuries. Along those lines, it claims Dr. Meehan's testimony is unreliable because he failed to rule out that potential alternative cause. We disagree. Dr. Meehan's report demonstrates that he considered and ruled out several alternative causes of the damage to Iskandia's wells, such as additional injection into nonproductive intervals containing completed wells, injection by other operators, and deliberate perforation of nonproductive intervals by Iskandia itself.

Dr. Meehan concluded that Iskandia's injections were not capable of causing its own injuries because it injected produced water back into the same formation from which it came, and in relatively low volumes. He contrasted Iskandia's injection activity with that of other operators, including SWEPI, who injected at high rates into producing zones with source water originating from different producing intervals. Dr. Meehan compared the combined total fluid production and water injection activity for Iskandia's wells over the relevant time period. Dr. Meehan concluded that injection from SWEPI's wells were the primary source of the high-pressure saltwater that damaged Iskandia's wells.

15

Dr. Meehan also ruled out Iskandia's injuries resulting from its own perforations in the nonproducing middle layer of the DMG. In contrast to SWEPI's claim that the new perforations added to Iskandia's wells in the DMG midsection caused the saltwater migration into Iskandia's wells, Dr. Meehan opined that multiple wells had been present for some time and both operators had produced from and injected into that layer.

Based on Dr. Meehan's report and his deposition testimony, we conclude he considered and ruled out, with reasonable certainty, plausible alternative causes raised by the evidence. *See id.*, 664 S.W.3d at 80.

### (ii) Damages

In addition, SWEPI claims Dr. Meehan's testimony as to damages is unreliable because it is based on the forecasted oil and gas production derived from the reservoir simulation. SWEPI argues the unreliability of the simulation causes Dr. Meehan's conclusions based on the simulation to be unreliable, as well. Because we found no basis in this record to conclude the reservoir simulation was unreliable, we are not persuaded by this argument.

Dr. Meehan testified that in calculating Iskandia's damages, he considered the three approaches to determining fair market value, concluded the cost approach and the comparable sales approach were unworkable here, and ultimately applied the income approach using the discounted cash flow method. *See Phillips v. Carlton Energy Group, LLC*, 475 S.W.3d 265, 278 (Tex. 2015) ("Fair market value is generally determined either by using comparable market sales, calculating replacement cost less depreciation, or capitalizing net income—that is, profits."). Dr. Meehan calculated net present values of future cash flows, an approach that "consists of estimating the net operating income stream of a property and applying a capitalization rate to determine the property's present value." *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172

16

(Tex. 2009) (per curiam). Dr. Meehan calculated Iskandia's damages based on the change in the fair market value of the subject leases before and after SWEPI's alleged trespass.

SWEPI gives three examples of Dr. Meehan's conclusions as to damages that it deems to be unreliable. First, it claims Dr. Meehan increased Iskandia's projected production rates over two and a half times despite having no documentation about Iskandia's plans to rework any wells in the Dimmitt Field, a projection SWEPI states was based on work Iskandia had done in other fields and a hypothetical reworking of Iskandia's Dimmitt Field wells. SWEPI characterizes this as "rote speculation" and "classic unreliable valuation testimony." However, Dr. Meehan testified that his communication with Iskandia indicated they planned to use procedures for increased fluid withdrawal and his projected production rates were based on historical production data from Iskandia's wells in "this field." He stated he was estimating what the fields would produce based on what they produced before SWEPI's injection of saltwater, and his estimate was consistent with what the field was producing just a few years earlier.

Second, SWEPI asserts Dr. Meehan based his valuation "as of May 2019" yet he included information that followed that date. SWEPI argues that fair market values are to be "restricted to data that would have been known by or available to willing buyers and willing sellers as of the valuation date." *See Apollo Expl., LLC v. Apache Corp.*, 631 S.W.3d 502, 537 (Tex. App.— Eastland 2021), *rev'd in part*, No. 670 S.W.3d 319 (Tex. 2023). While the calculation for determining the loss of market value is generally "the difference in the reasonable market value of the property immediately before and immediately after the injury[,]" when, as is the case here, "the damage results from an ongoing condition rather than a single event . . . courts apply a 'more flexible rule.'" *Crosstex N. Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 611 (Tex. 2016) (internal citation omitted). "Damage from a continuing cause necessarily becomes more than it is at the onset[,]" and determining the value of the land immediately after the damage started "would

17

be unduly restrictive." *Burns v. Lamb*, 312 S.W.2d 730, 734 (Tex. App.—Fort Worth 1958, writ ref'd n.r.e.).

Third, SWEPI presents Dr. Meehan's lack of inclusion of a reserve risk until his third report and questions that Dr. Meehan himself called the risk factor he included "arbitrary." Dr. Meehan testified that there are no published, industry-accepted reserve risk factors for cases like this, and he obtained the 20% figure by running several sensitivity analyses and looking at the production profile. We conclude any concern about Dr. Meehan's opinions on the reserve risk factor included in his damages calculations is for the factfinder to consider when determining what weight to give his opinion and does not determine admissibility itself. *See In re Payne*, 605 S.W.3d 240, 246 (Tex. App.—San Antonio 2020, no pet.).

In sum, Dr. Meehan's testimony on causation and damages meets the minimum standards for reliability and admissibility. *Robinson*, 923 S.W.2d at 557. He used data from, among other sources, the Railroad Commission, and recorded measurements from Iskandia and SWEPI to assist in the creation of the geologic Petrel model and the tNavigator reservoir simulation. Both the software and the methodology meet well-accepted industry standards. Dr. Meehan's testimony comports with the *Robinson* factors, and there is no analytical gap between the data and the opinion proffered. *See Helena Chem.*, 664 S.W.3d at 74; *Robinson*, 923 S.W.2d at 557. Further, as we find the analysis behind Dr. Meehan's reservoir simulation and the underlying data to be reliable, we likewise conclude that the analysis behind his damage estimates based on the reservoir simulation is also reliable. Ultimately, we are reminded that trial courts are not to determine "whether an expert's conclusions are correct, but only whether the analysis used to reach them is reliable." *See Gammill*, 972 S.W.2d at 728. On this record, we conclude the trial court abused its discretion in excluding Dr. Meehan's testimony as to causation and damages.

We sustain Iskandia's first issue.

18

### (2) Bintu Randriamampandry's testimony

In its second issue, Iskandia urges the trial court abused its discretion in excluding its other expert, Bintu Randriamampandry, because he was qualified, and his opinions would assist the jury in deciding the case. In the trial court, SWEPI argued Bintu was unqualified to testify and his opinions were inadmissible because they were irrelevant, unhelpful, and unreliable. Again, we look to Rule 702, and we first examine Bintu's qualifications based on his knowledge, skill, experience, training, or education. TEX. R. EVID. 702; *Helena Chem.*, 664 S.W.3d at 73.

### (a) Qualifications

Bintu is a professional geologist, registered in Canada, and employed by FracMod. Bintu's role as an expert was to help create the Petrel subsurface model on which Sawhney later ran the reservoir simulation model. Bintu used his expertise to determine the geologic stratigraphy of the Dimmitt Field and the lateral extent of the geologic strata there based on porosity.

Bintu's qualifications include a bachelor's degree in geology and seven years' experience evaluating international oil and gas reservoirs and developing 3D subsurface models. Bintu inputted publicly available data into the Petrel program to create a subsurface geological model of the Dimmitt Field. Bintu's education and experience qualify him to produce the Petrel subsurface model used here and make determinations about the underground geology based on the model.

SWEPI argues Bintu's lack of experience with the Permian Basin, Dimmitt Field, or the DMG, more specifically, renders him unqualified to testify, but it has produced no authority demonstrating that a geologist with years of experience creating and evaluating subsurface models is unqualified simply because he has not previously worked in a specified geographical region. The cases SWEPI cites center around lack of experience in a particular field of knowledge or practice—not lack of experience in a geographical area—as a basis for exclusion of expert testimony. *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996) (ER doctor's testimony

19

properly excluded when he did not testify that he knew the effectiveness of neurosurgical treatments to a brain-injured patient); *McMahon v. Zimmerman*, 433 S.W.3d 680. 688 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (portions of a family law professor's affidavit properly excluded; lack of experience practicing family law cited as one of several grounds); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 806 (Tex. 2006) (chemist's testimony improperly admitted because he had no experience with tire chemistry, a "highly specialized field"). Bintu's education and experience as a geologist rendered him qualified to produce and interpret a subsurface model of the Dimmitt Field, even though it was his first time to consider the particular geology of the Permian Basin.

### (b) Relevance

In the trial court, SWEPI additionally challenged the relevance of Bintu's testimony on the basis that it was unrelated to any of the issues in the case and unhelpful to the jury. On appeal, SWEPI does not raise the relevance argument. We find Bintu's Petrel model and opinions about subsurface geology are relevant and helpful to the trier of fact because they helped to explain the underground movement of the saltwater that Iskandia alleges SWEPI introduced into the subsurface through its injection wells. *See* TEX. R. EVID. 702; *Robinson*, 923 S.W.2d at 556.

### (c) Reliability

SWEPI also challenged the reliability of Bintu's testimony. In so doing, SWEPI took a number of remarks Bintu made during his deposition out of context to demonstrate that his underlying data was "overinflated, insufficient, and manipulated."

Our review of this testimony reveals that Bintu explained the basis of each of SWEPI's challenged remarks. Bintu explained the terminology of "corrected" and "uncorrected" data and why each type of data would be used in his model. He testified that the permeability analysis was calculated as part of the reservoir simulation and was not a part of his assignment. Bintu testified

that the Petrel model at times used porosity values from wells miles away from the injection well in question but doing so is based on using available data and interpolation for areas where less data is available, a method Bintu testified is common in modeling practice and produced consistent porosity values in this case. At one point Bintu indicated he performed a calculation that showed a potential 43% differential in the measurement of original oil in place, but Bintu explained that this calculation was a preliminary calculation that was superseded by the detailed calculations performed during the reservoir simulation, and, again, he testified that performing these preliminary calculations is common in the industry. Bintu was questioned about "pseudo depths" of certain wells that may have been used for data in his model. Although Bintu could not verify whether the certain depth data that was provided to him was modified or not, he testified that it would not have affected the geological model because the model is based on vertical well data and the tops, which would still be in the correct place, with the logs in the correct space, were of import rather than the well depths.

SWEPI's argument regarding Bintu's basis for determining accuracy of the Petrel model is a mischaracterization of his testimony, as Bintu testified that the model is based on the underlying data and he explained at length how the Petrel model can be, and was, compared not only to known data in published papers, but also to SWEPI's own report on the Dimmitt Field, to check for its reliability.

We determine Bintu was qualified to testify as an expert witness for Iskandia, and his opinions were relevant and the analysis behind them reliable. *See* TEX. R. EVID. 702; *Helena Chem.*, 664 S.W.3d at 73–74. Thus, we conclude the trial court abused its discretion in excluding his testimony.

We sustain Iskandia's second issue.

## SUMMARY JUDGMENT

In its third issue, Iskandia contends the trial court erred in granting summary judgment in favor of SWEPI, arguing that more than a scintilla of evidence exists to support the challenged elements of its trespass claim.

### A. Standard of review

We review de novo a trial court's grant of summary judgment. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). "[We] examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inferences and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). After adequate time for discovery, a party may move for summary judgment "on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). The nonmoving party must then present evidence that raises a genuine issue of material fact as to each element specified in the summary judgment motion. *Helena Chem.*, 664 S.W.3d at 72. When, as here, the trial court's summary judgment order does not specify the grounds on which it was granted, "we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

SWEPI moved for summary judgment alleging Iskandia had no evidence of one or more elements of its trespass claim. In a cursory statement accompanying that claim, it noted the Supreme Court of Texas had never recognized a cause of action for trespass based on deep subsurface water migration. Nonetheless, it urged that, if the claim was valid, "Iskandia must plead and prove that: (1) Iskandia owned or had lawful right to possess real property; (2) SWEPI entered Iskandia's land, and the entry was physical, intentional, voluntary, and unauthorized; and (3)

22

SWEPI's trespass caused injury to Iskandia's right of possession." (Emphasis omitted). For these elements, SWEPI relied on *Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex. App.—Fort Worth 2006, pet. denied), a trespass suit brought by one neighbor against another based on a tree-cutting incident allegedly undertaken without a homeowner's consent. As grounds, then, SWEPI claimed that Iskandia had no evidence of the following: (1) that SWEPI intentionally and voluntarily entered or caused any entry into "the Wells;" or (2) that Iskandia suffered any injury to its right of possession.

Responding, Iskandia protested SWEPI's characterization of the required elements of the claim at issue. It argued below, as it does on appeal, that in bringing its motion for summary judgment, SWEPI wrongly included factors not required as essential elements of a trespass cause of action relative to the claim at issue. It urges that a trial court cannot grant a summary judgment on a ground that includes a matter that is not an essential element of the applicable cause of action. *See Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 696 (Tex. 2017) (calling for strict enforcement of the requirement that a no-evidence motion must specifically identify the challenged elements of a claim to satisfy Rule 166a(i)). Given the parties' threshold dispute over the required elements of Iskandia's trespass claim, we first consider the nature of the trespass cause of action but only to the extent of the issues raised by SWEPI's motion.[7]

## B. Trespass law

In several recent cases, the Supreme Court of Texas addressed different aspects of trespass jurisprudence in relation to the type of property interests impacted by the claim at issue. First, in *Environmental Processing Systems*, the Court considered a claim by a landowner against its

---

[7] In the trial court, Iskandia asserted that the proper elements of trespass include a lack of consent, and to show proof of a lack of consent, it submitted the affidavit of its corporate representative establishing that it never consented to allow SWEPI's saltwater to enter its leases. On appeal, no issue is raised about the element of consent. Rather, the parties agree Iskandia must show evidence of causation and damages to defeat SWEPI's no-evidence motion for summary judgment.

adjacent neighbor, an operator of a wastewater disposal facility. *Env't Processing Sys., LLC v. FPL Farming Ltd.*, 457 S.W.3d 414, 416 (Tex. 2015). There, "the landowner alleged that wastewater had migrated into the deep subsurface of its land, possibly contaminating the briny groundwater beneath it." *Id*. at 417. In discussing its historical treatment of common law trespass, the Court noted it had "consistently defined a trespass [cause of action] as encompassing three elements: (1) entry (2) onto the property of another (3) without the property owner's consent or authorization." *Id*. at 419. More closely addressing the first element, the Court reiterated that it had historically determined that "every *unauthorized* entry upon land of another is a trespass even if no damage is done or injury is slight, and gives a cause of action to the injured party." *Id*. at 421 (quoting *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 12 n.36 (Tex. 2008)) (emphasis in original) (noting that a trespass against a possessory interest does not require actual injury to be actionable and may result in an award of nominal damages). Expanding on the meaning of an unauthorized entry, the Court observed it had recognized in 2011 that a trespass may occur "when one enters—or causes something to enter—another's property." *Id*. (quoting *Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011)) (per curiam). Because the Court otherwise found the jury charge had provided the correct definition for lack of consent, and because the jury returned a verdict in favor of the defendant, the Court ultimately determined it had no need to address whether Texas law in fact recognized a trespass for deep subsurface wastewater migration. *Id*. at 416.

Second, in the context of an oil-and-gas case brought in 2017, the Court expounded on the second element of a trespass claim, that is, the nature of the property interests at issue. In *Lightning Oil*, a dispute arose between two mineral estate lessees operating adjacently in the subsurface of an owner's tract of land. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 43 (Tex. 2017). There, Anadarko, an oil-and-gas operator, entered into a lease restricting its use of

a surface estate, requiring instead that it drill from an off-site location "when prudent and feasible." *Id.* Thus, Anadarko planned to locate well sites on the surface of an adjacent tract of land, and to use horizontal drilling to produce minerals from its lease. *Id.* The adjacent tract owner, Briscoe Ranch, Inc., agreed that Anadarko could drill from the surface of its property. *Id.* However, Lightning Oil, the lessee of the minerals underlying Briscoe's land, was not a party to the surface agreement. *Id.* As a result, Lightning Oil sought to enjoin Anadarko from drilling on the Ranch, claiming as a mineral lessee that its consent was otherwise necessary before Anadarko could drill through the subsurface covered by its mineral lease. *Id.* Among its claims, Lightning Oil brought an action against Anadarko for trespass and tortious interference with a contract, and it also sought injunctive relief. *Id.*

Addressing the trespass cause of action, the Court noted that "ownership of property does not necessarily include the right to exclude *every* invasion or interference based on what might, at first blush, seem to be rights attached to the ownership." *Id.* Illustrating this general concept, the Court quoted from its 2008 opinion in *Coastal Oil* wherein it described that "[w]heeling an airplane across the surface of one's property without permission is a trespass; flying the plane through the airspace two miles above the property is not." *Id.* (quoting *Coastal Oil*, 268 S.W.3d at 11). To this extent, the Court reiterated that "the rules for trespass are different on the surface of the earth from those that apply two miles above or below it." *Id.* at 48 (citing *Coastal Oil*, 268 S.W.3d at 11). The difference primarily flowed from the nature of the property rights at issue. As the Court explained, "a trespass is not just an unauthorized interference with physical property, but also is an unauthorized interference with one of the rights the property owner holds." *Id.* at 49.

*Lightning Oil* reiterated the basic principle that "[w]hen the owner of a fee simple estate severs the mineral estate by a conveyance, five rights are conveyed to the transferee or grantee: (1) the right to develop, (2) the right to lease, (3) the right to receive bonus payments, (4) the right

25

to receive delay rentals, and (5) the right to receive royalty payments." *Id*. (citing *Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016)). To that end, *Lightning Oil* observed that an oil and gas lessee is generally only granted the right to develop under a lease. *Id*. (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248–49 (Tex. 2013)); *Stephens Cnty. v. Mid-Kansas Oil & Gas Co.*, 254 S.W. 290, 292 (1923)). Still, the development right includes "the right to go onto the surface of the land to extract the minerals, as well as those incidental rights reasonably necessary for the extraction." *Id*. (citing *Merriman*, 407 S.W.3d at 248–49).

Moreover, *Lightning Oil* further observed that the right to develop has long been recognized as a property right. *Id*. (citing *Brown v. Humble Oil & Refin. Co.*, 83 S.W.2d 935, 940 (Tex. 1935)) (recognizing the ownership of oil and gas in place gives to the lessee a determinable fee therein). That is, the right to develop has been variously described as including "the exclusive right to possess, use, and appropriate gas and oil"; "the exclusive right to appropriate [the minerals] to any extent desired by the grantee and his assigns"; "the exclusive right to conduct operations to mine, store, and transport [the minerals]"; and "the exclusive right to prospect for, produce, and dispose of the minerals." *Id*. (citing *Stephens Cnty.*, 254 S.W. at 293–94).

Yet, noting an important distinction, *Lightning Oil* also pointed out that the rights conveyed by a mineral lease do not include the right to possess the specific *place* or *space* where the minerals are located. *Id*. To establish a cause of action, then, the Court noted "an unauthorized interference with the *place* where the minerals are located constitutes a trespass as to the mineral estate *only if* the interference infringes on the mineral lessee's ability to exercise its rights." *Id*. at 49 (emphasis added). As a basis of its claim, Lightning Oil argued that Anadarko's proposed drilling activities and underground well structures interfered with the mineral themselves, as the operations would likely extract "a quantum of minerals" as part of its process. *Id*. at 50. Specifically, Lightning Oil argued the amount of minerals lost would roughly equate to "the amount of minerals embedded in

26

fifteen cubic yards of dirt and rock for each thousand linear feet drilled with an eight-inch wellbore." *Id*. 50. The Court clarified, however, that "Lightning does not have any right to the materials surrounding any such minerals—only the minerals themselves, which will be a much smaller quantity than the mass of the materials in which they are lodged." *Id*. On that score, it next noted, "[w]hether the small amount of minerals lost through that process will support a trespass action must, in the end, be answered by balancing the interests involved, as we did in *West*." *Id*. (citing *Humble Oil & Refining, Inc. v. West*, 508 S.W.2d 812, 816 (Tex. 1974)). On that score, *Lightning Oil* took note that *West* weighed "the interest of society and the interests of the oil and gas industry as a whole against the interest of the individual operator." *Id*. Ultimately, however, the Court rejected the claim only because of the small size of the injury claimed finding that Lightning Oil's interests had been outweighed given "the loss of minerals Lightning will suffer by a well being drilled through its mineral estate is not a sufficient injury to support a claim for trespass." *Id*. at 51.

Finally, in a more recent case from the Supreme Court of Texas, it summarized the extent of its recognition of a trespass claim relative to the property interest at issue. In *Regency Field Services*, the Court confirmed that "a trespass claim alleging unauthorized physical entry upon the claimant's land or other invasion of a possessory property interest generally accrues when the unauthorized entry occurs, even if the entry does not cause a discernable injury or damages." *Regency Field Servs., LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807, 816 n.18 (Tex. 2021) (citing *Lightning Oil*, 520 S.W.3d at 49; *Coastal Oil*, 268 S.W.3d at 11 n.28). That type of claim, it noted, is supported by the violation of a claimant's exclusive possessory right, and thus, proof of a possessory interest is an element of the claim itself. *Id*. (citing *Coastal Oil*, 268 S.W.3d at 9) (explaining that an "injury to the right of possession" supports a judicial remedy). The Court reiterated that such claim is actionable even "if no damage is done or the injury is slight." *Coastal*

27

*Oil*, 268 S.W.3d at 12 n.36. Distinguishing a landowner's interest, however, the Court also noted it had not yet determined whether subsurface migration can cause an actionable trespass to a surface owner's possessory interest in the subsurface space. *Regency Field Servs.*, 622 S.W.3d at 816 n.18 (citing *FPL Farming Ltd.*, 457 S.W.3d at 416) (declining to decide "whether deep subsurface wastewater migration is actionable as a common law trespass in Texas"). Notably, however, *Regency Field Services* otherwise confirmed that because claimant Swift asserted claims for trespass to its nonpossessory rights as a mineral lessee, it brought forth the type of claim that was recognized by the Court in *Lightning Oil*. *Id*. Accordingly, based on the Supreme Court's recent jurisprudence in this area, we conclude that a trespass claim based on an unauthorized interference with a lessee's development right is recognized by *Lightning Oil* and *Regency Field Services* as long as the injury is not outweighed by competing interests in the oil and gas context, which the parties have not addressed in this appeal. *See Lightning Oil*, 520 S.W.3d at 51; *West*, 508 S.W.2d at 816. Based on these principles, we construe SWEPI's motion for summary judgment as challenging Iskandia's evidence in support of the elements of causation and damages required of its trespass claim.

## C. Analysis

### (1) Causation

In the absence of controlling precedent governing what evidence is necessary to establish causation in a case of subsurface trespass to a mineral lessee's right to develop its mineral estate, we are guided by analogous cases addressing causation in the context of a trespass occurring by a migrating substance both above ground and below it.

First, in a case asserting multiple theories including trespass based on alleged underground water migration, our sister court of appeals determined causation-in-fact to be an element common to all claims at issue. *See Palma v. Chribran Co., L.L.C.*, 327 S.W.3d 866, 868–69 (Tex. App.—

Beaumont 2010, no pet.). "To establish that an event is the cause-in-fact of the injured party's damages," the court stated, "the plaintiff must establish that the defendant's 'act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.'" *Id.* at 869–70 (quoting *IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. App.—Beaumont 2010, no pet.)).

Second, and more recently, in a case from the higher court involving an above-ground trespass decided after *Lightning Oil*, and in which expert testimony on causation had also been challenged, the Court more specifically detailed the requirements of causation in support of a trespass claim. *See Helena Chem.*, 664 S.W.3d at 71. Because *Helena Chemical* more closely resembles the liability theory of this case, as well as mirroring the procedural posture at issue here, we consider it helpful in guiding our analysis.

In *Helena Chemical*, plaintiffs sought recovery under various theories, including trespass, for a reduced cotton crop due to herbicide drift arising from aerial application of the product on a neighbor's property. *Id*. Procedurally, the Court addressed a no-evidence motion for summary judgment which argued that no evidence supported the element of causation, an essential element of recovery under all of plaintiffs' claims. *Id.* Regarding proof of specific causation, *Helena Chemical* noted it was important to recognize that plaintiffs had not sought recovery for "damage" to their cotton plants, (i.e., wilted leaves), but rather, "the injury for which the plaintiffs [sought] recovery [was] a financial one—decreased revenue from a reduced yield of cotton at harvest." *Id*. at 75. The Supreme Court clarified that "it is therefore not enough for the plaintiffs to show that drifting herbicides reached their plants and 'damaged' them in some way." *Id*. Rather, the plaintiffs had to in fact show the drifting herbicide "caused their plants to yield less cotton at harvest." *Id*.

Yet, the Court also stressed a procedural point, that is, that such proof was only needed for plaintiffs to succeed at trial. *Id*. At the summary judgment stage, it noted that plaintiffs only needed

to proffer some evidence creating a genuine fact issue as to whether defendant's application of herbicide caused the reduced crop yield for which they sought damages. *Id.* (citing *Draughon v. Johnson*, 631 S.W.3d 81, 88 (Tex. 2021)). To that end, the Court specified, "[t]here must be reliable evidence that the failed crops for which recovery is sought were more likely than not (1) exposed to the harmful chemical, (2) at levels of exposure sufficient to cause the lost yields alleged." *Id*. at 76. Additionally, it described "[t]here must be reliable evidence ruling out other plausible alternative causes of the lost yields." *Id*. "Without some scientifically reliable evidence of these facts, the evidence of causation offered does not rise above subjective belief and will not survive a no-evidence motion for summary judgment." *Id*. (citing *Robinson*, 923 S.W.2d at 557).

Based on the principles of these cases, we determine that in order to survive summary judgment on the element of causation, Iskandia shouldered a burden to demonstrate exposure of its wells to water originating from SWEPI at levels sufficient to cause the loss it claimed by its pleading. We turn our attention first to the purported exposure of the wells to SWEPI's wastewater and whether the exposure occurred at sufficient levels to cause loss of oil development and production.

### (a) Evidence of exposure to excessive amounts of saltwater

Iskandia urges the following evidence created a genuine fact issue as to whether SWEPI caused saltwater to enter Iskandia's wells at a level that damaged the wells beyond repair, thereby diminishing their oil production. Viewing the evidence favorable to Iskandia, as we must, it established by means of deposition testimony and public records, that SWEPI erected several saltwater injection wells in the immediate vicinity of Iskandia's producing oil wells.[8] Those records further show that SWEPI greatly increased the volume of its saltwater disposal in the

---

[8] At his deposition, Todd Reynolds testified that SWEPI's Bass and San Saba saltwater injection points were located near Iskandia's WD Johnson E and F wells, and its Colorado injection point was close to Iskandia's Slash R and Slash T wells.

injection wells from 58,000 barrels of saltwater per day in December 2018 to over 2 million barrels per month in October 2019, as compared to Iskandia's 180,000 barrels. In total, Iskandia claimed the records established that SWEPI injected over 75 million barrels of non-native saltwater in just three years, an amount almost equivalent to what Iskandia and its predecessors injected in the same area over a period of 35 years. By July 2019, Iskandia's records showed that it became aware of substantial volumes of high-pressure saltwater flooding some of its wells. Dr. Meehan's report identified that Iskandia's records showed "the F3, F5 and F7 wells were flowing salt water to surface and the F8 well showed a high fluid level indicative of increased pressure." He further stated, "[i]n September 2019, the F4 also produced fluid to surface having had fluid levels deeper than 2,500' as recently as April 2018." Additionally, he described "the F2 began flowing saltwater to surface in late 2019." Finally, he pointed out that additional wells exhibited significant pressure increases due to saltwater encroachment in 2021. Dr. Meehan opined that, as these wells began filling with fluid, the wells' oil production decreased. In total, the evidence showed that 15 of Iskandia's wells were damaged beyond repair, and another 18 were negatively impacted, due to SWEPI's injection of saltwater in the producing zone. Addressing future harm, Dr. Meehan concluded that "SWEPI has caused all the damage to the 33 wells described [by his report] and will more likely than not damage beyond repair not less than 50 additional wells in the next 1–15 years."

Regarding Iskandia's proof of causation, Dr. Meehan stated that, based on Iskandia's raw well data and the geologic formation as illustrated by the reservoir simulation model, "with reasonable geologic certainty . . . there is communication between the zones into which SWEPI injectors are injecting saltwater and the producing intervals in Iskandia leases." This "communication," that is, connecting underground channels, allows saltwater to flow from one area to the next. Dr. Meehan also stated that "injection from [three of SWEPI's wells] are the

31

primary source of high-pressure saltwater that has affected Iskandia's wells" and "fluids between the Washita well and the Iskandia leases were displaced onto the Iskandia leases."

### (b) Accounting for plausible alternative causes

As noted above, an expert's opinion on causation must also account for plausible alternative causes. In *Robinson*, the Supreme Court observed that an expert's "failure to rule out other causes of the damage renders his opinion little more than speculation." *Robinson*, 923 S.W.2d at 559. Significantly, however, alternative causes need not necessarily be ruled out entirely. In *Bostic v. Georgia-Pacific*, the Court explained that in cases where multiple causes might have contributed to the injury or condition, the expert does not have to completely eliminate the other causes as possible contributors. *Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 351 (Tex. 2014). Rather, the expert's analysis of alternative causes must be sufficient for the fact-finder to reasonably conclude that the defendant's conduct was a "substantial factor" in causing the injury. *Id*. at 350–51. As noted in *Helena Chemical*, the testimony need only account for "other plausible causes *raised by the evidence.*" *Helena Chem.*, 664 S.W.3d at 81 (quoting *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010)) (emphasis in original).

Here, the evidence indicated the plausibility of two alternative causes—Iskandia's own injection of saltwater into the formation as well as like activity by other operators of the area. Through his opinion testimony, Dr. Meehan accounted for these other plausible alternatives before reaching his conclusions. Because we have previously determined that the trial court abused its discretion in excluding both Dr. Meehan's and Bintu's testimony on causation, and because their testimony constitutes more than a scintilla of evidence creating a material fact issue as to the element of causation, we conclude that the trial court erred in granting SWEPI's no-evidence motion for summary judgment on this ground. *See* TEX. R. CIV. P. 166a(i).

32

### (2) Damages

Further, as to SWEPI's argument that there was no evidence of damages, Iskandia offered such proof through Dr. Meehan's testimony and reports. As discussed above, Dr. Meehan applied the income approach using the discounted cash flow method to determine fair market value of Iskandia's property. He then calculated net present values of future cash flows, and ultimately calculated Iskandia's damages by comparing the fair market value of the leases in question before and after SWEPI's alleged trespass.

Dr. Meehan concluded that SWEPI's activities damaged 15 of Iskandia's wells beyond repair and negatively impacted another 18 wells. Dr. Meehan also determined SWEPI's actions will damage at least 50 additional wells beyond repair in the next 1 - 15 years. Dr. Meehan quantified Iskandia's past and future damages, after being adjusted for "reserve risk" of 20%, at $29.9 million dollars. We conclude that Dr. Meehan's opinion testimony and reports constitute more than a scintilla of evidence creating a material fact issue as to Iskandia's damages to its oil development rights. *See Lightning Oil*, 520 S.W.3d at 49 ("an unauthorized interference with the *place* where the minerals are located constitutes a trespass as to the mineral estate only if the interference infringes on the mineral lessee's ability to exercise its rights")

In summary, the testimony adduced from Dr. Meehan and Bintu Randriamampandry provided more than a scintilla of evidence creating a material fact issue that SWEPI's wastewater damaged its wells, thus raising the genuine issue of material fact necessary to survive summary judgment, and SWEPI was not entitled to a no-evidence summary judgment on the grounds of causation and damages. *See* TEX. R. CIV. P. 166a(i); *Helena Chem.*, 664 S.W.3d at 82; *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021). Thus, the trial court erred in granting SWEPI's no-evidence motion for summary judgment.

We sustain Iskandia's third issue.

## CONCLUSION

Having sustained all three of Iskandia's issues, we reverse the trial court's orders granting SWEPI's motions to exclude testimony of D. Nathan Meehan, Ph.D., P.E., and Ambinintsoa "Bintu" Randriamampandry, we reverse the order granting SWEPI's no-evidence motion for summary judgment, and we remand this case to the trial court for further proceedings consistent with this opinion.

GINA M. PALAFOX, Justice

October 31, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.